UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| GRANDPARENTS.COM, INC., | Case No. 17-14711 |
| GRAND CARD LLC, | Case No. 17-14704 |
| Debtors.[1] | |

_____/

**DECLARATION OF JOSHUA RIZACK IN SUPPORT OF**
**THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

STATE OF NEW YORK            )
                             ) SS:
COUNTY OF NEW YORK           )

**BEFORE ME**, the undersigned authority, personally appeared JOSHUA RIZACK in New York, New York, who after being duly sworn, deposes and says as follows:

1.      My name is Joshua Rizack. I am the President and Senior Managing Director of The Rising Group Consulting, Inc. ("TRGC"), a restructuring and financial advisory firm that specializes in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. I am over the age of 18 and competent to testify. I am the Chief Restructuring Officer ("CRO") of debtors Grandparents.com, Inc. ("GP") and Grand Card LLC ("Grand Card", and together with GP, the "Debtors"), and non-debtors Grandparents Insurance Solutions, LLC ("GIC"), and American Grandparents Association, LLC ("AGA").

---

[1] The address and the last four digits of the taxpayer identification of each of the debtors: (i) Grandparents.com, Inc., 589 8th Avenue, 6th Floor, New York, NY 10018 (1114), and (ii) Grand Card LLC, 10800 Biscayne Blvd., Suite 750, Miami, FL 33161 (3030).

{41328394;11}

2. To minimize any adverse effect on the Debtors' businesses as a result of the commencement of the above-captioned Chapter 11 cases (the "Cases"), the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief and are designed to, among other things (a) continue the Debtors' operations with as little disruption as possible; (b) allow the Debtors to continue serving their valued customers and operate their business pending a restructuring of the Debtors' debt and/or a sale of the Debtors' assets; and (c) establish procedures for the smooth and efficient administration of these Cases. The relief requested in the First Day Motions will be crucial to the success of the Debtors' efforts to facilitate an orderly reorganization to be effectuated through the contemplated restructuring of the Debtors' debts and/or a sale of the Debtors' assets.

3. I submit this declaration (this "Declaration") in support of the Debtors' Chapter 11 voluntary petitions and the First Day Motions. As the CRO of the Debtors, I have personal knowledge of the Debtors' books and records, and the Debtors' financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees and advisors. In making the statements herein based upon my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees, I have relied upon these employees to accurately record, prepare, and collect any such documentation and other information.

4. If I were called upon to testify as a witness in this matter, I would and could competently testify as to each of the facts set forth herein based upon my personal knowledge,

review of documents, or my personal opinion, except as otherwise noted. I am authorized to submit this Declaration on behalf of the Debtors.

## I.    The Chapter 11 Filing.

5.    On April 14, 2017 (the "Petition Date"), the Debtors filed voluntary petitions for relief from this Court under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

6.    By First Day Motion, the Debtors are requesting the Cases be jointly administered.

7.    As of the date hereof, no official creditors committee has been appointed in this case. In addition, no trustee or examiner has been appointed.

8.    The Debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## II.    Overview of Debtors' Corporate Structure.

Debtor GP is a Delaware corporation qualified to do business in, among other states, New York and Florida. Debtor Grand Card is a Florida limited liability company qualified to do business in, among other states, New York and Florida, and is a wholly-owned subsidiary of GP. Non-debtor AGA is a Florida limited liability company qualified to do business in Florida and is a wholly-owned subsidiary of GP. Non-debtor GIS is a Florida limited liability company and wholly-owned subsidiary of GP.

## III.    Description of Debtors' Businesses.

9.    Debtor GP owns and operates the Grandparents.com website (the "Website"), a membership organization and social media community which connects grandparents, seniors, and boomers to differentiated, discounted products and services. GP's business model is geared

toward providing group discount benefits for a small membership fee. The Website offers content on everything from health and well-being, relationships, and finances to recipes and travel tips. In addition, on October, 9, 2013, GP entered into a Program Agreement (the "Aetna Contract") with Aetna Life Insurance Company ("Aetna") to establish a Program to offer a Group Medicare Supplement Plan to AGA's Members, pursuant to which the Debtors' receive a commission for each policy sold. It is also contemplated that GP may seek the endorsement of some of its partners in order to offer the Program to members, customers, and subscribers of each such partner ("Third Party Member"). GP may also promote the Group Medicare Supplement Plan to other entities or groups that are not GP Members or Third Party Members.

10. Debtor Grand Card, a wholly-owned subsidiary of GP, is a cardholder rewards program that was to provide cash rebates on a debit card when cardholders purchase pharmaceutical products and services offered by participating merchants. On March 28, 2013, Grand Card and GP entered into an Alliance Agreement (the "Opus Agreement") with Cegidim Inc. (Opus Health Division) ("Opus") in order to develop high-value member benefit programs that provide cash rewards on a debit card to members of the general public who became holders of the "Grand Card", when the Members purchased certain selected products or services of participating sponsors who enrolled in the programs. However, due to insufficient transaction volume and other factors, the parties' relationship never materialized and the Opus Agreement expired by its terms on March 28, 2017. Grand Card is also a party to a master services agreement, as amended from time to time (the "Vantiv Agreement") with Vantiv, LLC ("Vantiv"), pursuant to which Vantiv purported to provide debit card issuing and payment processing products and services to Grand Card. For a number of reasons, including Opus' failure to provide the pharmaceutical rebates discussed above and pre-payments made by the

Debtors to Vantiv without receiving reasonable equivalent value in return, Grand Card's intended business never materialized and the company never earned a profit.

11. Non-debtor GIS is a licensed insurance broker and wholly-owned subsidiary of GP. On or about October 31, 2014, GIS entered into two Marketing General Agent Contract for Group Contracting Only with Aetna (the "MGA Contracts"). Pursuant to the MGA Contracts, GIS was named Marketing General Agent for Aetna and authorized to sell Medicare Advantage and Medicare Supplement policies, in exchange for payment of a commission. In addition, on August 26, 2016, GIS entered into an Aetna Marketing Agreement for Upline Licensed Agents and Agencies with Aetna, effective as of June 30, 2016 (the "MA Contract"). Pursuant to the MA Contract, GIS serves as a general agent and offers Group Medicare Supplement Insurance Policies to certain target customers in exchange for the payment of a commission. The initial term of the MA Contract is effective June 30, 2016 until June 30, 2017, with automatic annual renewals. GIS was established to facilitate the sale of Medicare insurance offered to the Debtors' Members through Aetna.

12. Non-debtor AGA is a wholly-owned subsidiary of GP, and was formed to unite grandparents, boomers, and seniors, and provides members access to a range of benefits including discounts on certain products and services for a $15 annual fee. AGA has approximately 1,613 members and generates approximately $20,311 in gross annual revenue.

**IV.    Historical Financial Performance.**

*i.    Total Gross Revenue for All Debtors and Non-Debtor Subsidiaries*

The Debtor's 2017 year to date gross revenue is $41,819; the Debtor's gross revenue for 2016 was $297,648; the Debtor's gross revenue for 2015 was $629,161; and the Debtor's gross revenue for 2014 was $332,933.

### ii. *Grandparents.com, Inc.*

GP's 2017 year to date gross revenue is $23,457; GP's gross revenue for 2016 was $252,113; GP's gross revenue for 2015 was $601,946; and GP's gross revenue for 2014 was $330,122.

### iii. *Grand Card LLC*

Grand Card had no gross revenue for 2017 to date, or 2014 through 2016.

### iv. *Grandparents Insurance Solutions LLC*

GIS's 2017 year to date gross revenue is $11,430; GIS's gross revenue for 2016 was $25,225; GIS's gross revenue for 2015 was $12,273; and GIS's gross revenue for 2014 was $0.

### v. *American Grandparents Association LLC*

AGA's 2017 year to date gross revenue is $6,932; AGA's gross revenue for 2016 was $20,311; AGA's gross revenue for 2015 was $14,942; and AGA's gross revenue for 2014 was $2,811.

## V.  Debtors' Prepetition Secured Credit Facility.

### A. *The Original Loan.*

Prior to the Petition Date, on July 8, 2015, GP, as borrower, entered into that certain Credit Agreement (the "Original Pre-Petition Credit Agreement") with VB Funding, LLC ("VBF"), as lender, pursuant to which VBF increased the principal balance of a prior bridge loan to GP from $1,000,000.00 to $8,000,000.00 (the "Original Pre-Petition Loan"), which Pre-Petition Loan was advanced to GP in two (2) disbursements. The Pre-Petition Loan was evidenced by a promissory note from GP to VBF in the principal amount of $8,000,000.00 (the "Original Pre-Petition Note"). On July 8, 2015, GP executed and delivered a Security

Agreement to VBF, which granted VBF a security interest in all of the assets of GP, with certain exclusions set forth therein (the "Original Borrower's Pre-Petition Security Agreement").

On July 8, 2015, Debtors GIS and Grand Card executed a Guaranty of the Original Pre-Petition Credit Agreement (the "Original Pre-Petition Guaranty"), whereby GIS and Grand Card guaranteed payment and performance of GP's obligations under the Original Pre-Petition Credit Agreement. On July 8, 2015, Debtors GIS and Grand Card executed and delivered a Security Agreement to VBF, which granted VBF a security interest in all of the assets of GIS and Grand Card, with certain exclusions set forth therein (the "Original Guarantors' Pre-Petition Security Agreement").

On July 8, 2015, the Debtors, as additional security for the Original Pre-Petition Loan, Original Pre-Petition Note, and Original Pre-Petition Guaranty, executed and delivered to VBF a Trademark Security Agreement (the "Trademark Security Agreement"), whereby the Debtors granted VBF trademark security interests in all of the Debtors' trademark collateral, as more specifically described in the Trademark Security Agreement.

On August 5, 2015, GP and VBF executed that certain Omnibus Amendment No. 1 (the "Amendment") to the Original Pre-Petition Credit Agreement, whereby GP and VBF agreed to remove certain rights of both parties under the Original Pre-Petition Credit Agreement.

### B. The Amended and Restated Loan.

On September 15, 2016, GP and VBF entered into an Amended and Restated Credit Agreement (the "Amended and Restated Pre-Petition Credit Agreement"), whereby VBF agreed to loan GP an additional $2,950,000 (the "Additional Pre-Petition Advance"), bringing the total amount due and owing from GP to VBF to $9,827,621.96 (collectively with the Original Pre-Petition Loan, the "Pre-Petition Loan"). The Pre-Petition Loan is evidenced by an Amended and

Restated Promissory Note dated September 15, 2016 from GP to VBF in the amount of $9,827,621.96 (collectively with the Original Pre-Petition Note, the "Pre-Petition Note").

## VI. Events Leading to Chapter 11 Bankruptcy Filings.

13. The Debtors have experienced significant competition in multiple areas, including advertising, visitors to the Website, registered users, subscribing members, and marketing partners. Further, much of the Debtors' revenue is derived from commissions and royalties, which fluctuate substantially based upon the current level of members and users. As a result of the foregoing and other factors, the Debtors have had difficulty generating meaningful revenue.

14. Additionally, the requirements of being a public company require the Debtors to incur substantial costs, including those associated with legal and financial compliance, and affect operating results and divert management's attention from day-to-day operations.

15. The Debtors have approximately $9,827,621.96 in principal outstanding under the Pre-Petition Loan, as well as $999,957 in principal indebtedness, including accrued management fees, assumed from GP Holding in connection with a February 2012 reverse merger transaction.

## VII. First Day Motions and Necessity for Emergency Hearings.

16. As CRO of the Debtors, I am generally familiar with the contents of each First Day Motions (including the exhibits thereto) described in further detail herein. Based upon that general familiarity and the information provided to me by other members of the Debtors' management team and my colleagues who report to me or provide information to me in the ordinary course of the Debtors' business, I believe that the relief sought in each First Day Motions is necessary to: (a) enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity and value; (b) allow the Debtors to continue serving their valued customers and operating their business pending a restructuring of their debt or a sale of the assets

of the Debtors; and (c) prevent immediate and irreparable harm to the Debtors' businesses as a whole. Concurrently herewith, the Debtors have filed or will be filing the following First Day Motions for which the Debtors request that the Court conduct a hearing as soon as possible after the commencement of the Debtors' bankruptcy cases (the "<u>First Day Hearing</u>"):

a. Motion for Order Authorizing Joint Administration of Related Chapter 11 Cases;

b. Motion for Authorization to File Consolidated Chapter 11 Case Management Summary;

c. Emergency Motion for Interim and Final Authority to Obtain Debtor-in-Possession Financing and for Use of Cash Collateral;

d. Emergency Motion for Orders Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9019 Approving Bidding Procedures, Assumption and Cure Procedures, and Scheduling a Sale Hearing;

e. Debtors' Emergency Application for Approval, on an Interim and Final Basis, of Employment of Steven R. Wirth and the law Firm of Akerman LLP as Bankruptcy Counsel for the Debtors-in-Possession *Nunc Pro Tunc* to the Petition Date;

f. Emergency Motion for Approval of Engagement Letter with The Rising Group Consulting, Inc. and Joshua Rizack to Provide Chief Restructuring Services to the Debtors *Nunc Pro Tunc* to the Petition Date and Request for Interim Relief;

g. Emergency Motion for Order (I) Authorizing Debtors to (A) Pay Pre-Petition Wages and Other Compensation, and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Institutions to Pay All Checks and Electronic Payment Requests, (III) Approving Debtors' Discretionary Employee Incentive Programs, and (IV) Granting Related Relief; and

h. Emergency Motion for (1) Authority to Continue Use of Existing Business Forms and Records; (2) Authority to Maintain Existing Corporate Bank Accounts and Cash Management System; and (3) Extension of Time to Comply with 11 U.S.C. § 345 Investment and Deposit Guidelines.

17. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical and necessary to the Debtors' ability to maximize the value of their assets for creditors and shareholders.

18. The Debtors will provide notice of all motions/applications presented to the Court for consideration as First Day Motions on all parties identified on the master service list.

### A. Debtors' Emergency Motion for Interim and Final Order Authorizing Debtors to Obtain Debtor-in-Possession Financing and for Use Cash Collateral Pursuant to 11 U.S.C. § 363

19. The Debtors intend to file an emergency motion seeking entry of an interim and final order authorizing the Debtors to obtain credit (the "DIP Loan") and use cash collateral (the "DIP Motion"). The DIP Loan is necessary because without immediate funding, GP will be unable to continue to operate its website, causing irreparable harm to the Debtors' most valuable asset, to the detrimental of creditors and other parties in interest.

20. Prepetition, GP and VB Funding LLC ("Lender") entered into that certain September 15, 2016 Amended and Restated Promissory Note, along with other related documents and agreements (the "Loan Documents") attached as Exhibit "B" to the Motion. The Lender advanced funds prepetition to GP. The loan obligations are secured by a first priority lien in all the assets of the Debtors. In addition, Debtor Grand Card and non-debtor Grandparents Insurance Solutions, LLC, both wholly-owned subsidiaries of GP, are guarantors under the Loan Documents. The Debtors acknowledge that the Loan Documents are valid and that the security interests granted by the Loan Documents to Lender are enforceable and unavoidable. The Debtors do not have any other secured creditors. GP acknowledges that as of the Petition Date, it owes Lender at least $9,827,621.96.

21. The Debtors propose that through the DIP Loan, they obtain post-petition financing from Lender under the same terms as set forth in the Loan Documents, except as otherwise modified therein.

22. The Debtors are unable to operate without the use of Cash Collateral and the DIP Loan.

23. The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to their employees without the Debtors granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

24. The Debtors and Lender are parties to a loan transaction secured by, among other things, all of the Debtor's personal property (the "<u>Collateral</u>"). As of the Petition Date, the Debtors acknowledge that generally all cash and cash equivalents of the Debtors were Lender's Collateral or proceeds of said Collateral (the "<u>Cash Collateral</u>"). Accordingly, for purposes of this Order, the Debtors acknowledge that Cash Collateral shall consist of any and all (i) cash or cash equivalents on hand (whether under the control of the Debtors or any third party) and cash collections of the Debtors, whether obtained prior to, on or after the Petition Date, (ii) cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any of the Collateral, whether obtained prior to, on or after the Petition Date and (iii) any other property of the Debtors that constitutes Cash Collateral, as provided in sections 363(a) and 363(c) of the Bankruptcy Code; provided that Cash Collateral does not include the proceeds of any Chapter 5

avoidance actions held or maintained by the Debtors. Subject to the provisions of this order, the Debtors are authorized to use Cash Collateral for the period of fourteen (14) days to pay: (a) amounts expressly authorized by this Court, including payments to the United States Trustee for quarterly fees; (b) the current and necessary expenses set forth in the budget attached as Exhibit "A" ("Budget") to the Cash Collateral Motion (including payroll) plus an amount not to exceed ten percent (10%) for each line item (provided no amount shall be disbursed for legal or accounting fees absent proper application and entry of an order by the Court); and (c) such additional amounts as may be expressly approved in writing by Lender. The Debtors shall provide Lender with bi-weekly reports which reflect their actual receipts and expenditures for the prior 2 week term, and the percentage variance per line item to the Budget. The interim authorization to use Cash Collateral will expire on April 28, 2017 at 5:00 p.m.

25. The Debtors' bankruptcy estates will suffer irreparable harm if the DIP Motion is not granted, because if the Debtors cease operations, they will lose their fair market value and ongoing concern value, which greatly exceeds their liquidation value.

26. Because of the Debtors' immediate need for the liquidity provided by the DIP Loan, the Debtors, in the exercise of their sound business judgment, and in consultation with their professional advisors, have concluded that the DIP lender is the only lender able to offer a post-petition credit facility sufficient to meet the Debtors' working capital and case funding needs on the terms, and within the time frame, required by the Debtors. Indeed, without immediate access to liquidity sufficient to sustain normal course business operations, the value of the Debtors' assets and their bankruptcy estates will be irreparably harmed to the extreme detriment of the Debtors' creditors and the bankruptcy estates.

27. Moreover, the Debtors have exercised sound business judgment in negotiating and agreeing to the proposed DIP Loan, the terms of which are fair and reasonable, and are in the best interests of their estates.

### B. Debtors' Emergency Motion for Orders Pursuant to §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9019 Approving Bidding Procedures, Assumption and Cure Procedures, and Scheduling Sale Hearing

28. The Debtors also intend to file a First Day Motion seeking approval of bid procedures and authority to sell substantially all of the assets of the Debtors to a stalking horse, subject to high and better offers, with a sale hearing pursuant to Section 363 ("Sale Hearing") to occur within 45 to 50 days enabling the debtor, GP, to be sold as an ongoing concern together with the assets of the related debtor and certain non-debtor subsidiaries.

29. Subject to Court approval, the Debtors have entered into an asset purchase agreement (the "APA") dated as of April 14, 2017 between the Debtors as sellers and VB Funding, LLC, as buyer (the "Stalking Horse" or "Stalking Horse Bidder"), providing for the Debtors to sell and the Stalking Horse to purchase the assets listed on Exhibit A (the "Purchased Assets") for a credit bid of $2,000,000.00, with $1,500,000 allocated to GP and $500,000 allocated to Grand Card.

30. The Bidding Procedures are intended to provide a flexible process allowing the Debtors to maximize the value of their assets given the severe liquidity constraints they currently face. The Debtors expressly reserve the right to modify the relief requested in this Motion prior to or at the applicable hearings, including modifying the proposed Bidding Procedures. Moreover, the Debtors reserve the right to adjourn the Auction or the Sale Hearing or remove any assets from the sale if the Debtors determine that such action will maximize value to their estates.

    **C.**    **Debtors' Emergency Application for Approval, on an Interim and Final Basis, of Employment of Steven R. Wirth and the law Firm of Akerman LLP as Bankruptcy Counsel for the Debtors-in-Possession *Nunc Pro Tunc* to the Petition Date, and**

31. The Debtors also intend to file a First Day Motion to employ Akerman LLP and Steven R. Wirth, Esq., as their general bankruptcy counsel in these cases. The Debtors understand that Mr. Wirth and Akerman have extensive experience representing Chapter 11 debtors in this district (and others across the country), and that they are well-qualified to serve as general bankruptcy counsel to the Debtors. The Debtors believe it is in the Debtors' best interests, and those of their creditors, that Mr. Wirth and Akerman be retained to serve as Debtors' general bankruptcy counsel in these Chapter 11 Cases.

    **D.**    **Debtors' Emergency Motion for Approval of Engagement Letter with The Rising Group Consulting, Inc. and Joshua Rizack to Provide Restructuring and Chief Restructuring Officer Services to the Debtors *Nunc Pro Tunc* to the Petition Date and Request for Interim Relief**

32. The Debtors also intend to file a First Day Motion to authorize the Debtors' entry into an engagement letter with me and my company, The Rising Group, Consulting Inc., to continue providing chief advisory restructuring and other financial services to the Debtors during these Cases. My services and those of my company, The Rising Group Consulting, Inc., are critical to the Debtors' successful reorganization, as we continue pre-Petition Date negotiations with the proposed DIP lender and potential bidders for the Debtors' assets. In addition, we are familiar with the business of the Debtors and are in the best position to advise them going forward.

  E. **Emergency Motion for Order (I) Authorizing Debtors to (A) Pre-Petition Wages and Other Compensation, and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests, (III) Approving Debtors' Discretionary Employee Incentive Programs, and (IV) Granting Related Relief**

33. The Debtors intend to file a First Day Motion seeking authority (i) to pay pre-petition wages, if any, (ii) to continue existing employee benefit plans and programs, and (ii) authorizing banks and other financial institutions to pay all checks and electronic payment requests. This relief is critical to the Debtors' ability to continue doing business on a normal basis, and will facilitate the Debtors' ability to accomplish a sale of the companies as a going concern.

  F. **Debtors' Emergency Motion for (1) Authority to Continue Use of Existing Business Forms and Records; (2) Authority to Maintain Existing Corporate Bank Accounts and Cash Management System; and (3) Extension of Time to Comply with 11 U.S.C. § 345 Investment and Deposit Guidelines.**

34. By this Motion, the Debtors request the entry of an Order: *(i)* authorizing them to continue using their existing business forms and records; (ii) authorizing Debtors to maintain their existing corporate bank accounts and cash management system; (iii) authorizing Debtors to pay any monthly Bank Account (as defined below) fees; and (iv) extending the time to come into compliance with 11 U.S.C. § 345(b).

35. The Debtors employ a Cash Management System in the ordinary course of business. The Cash Management System is similar to those commonly employed by corporate enterprises of size and complexity comparable to the Debtors. All of the Debtors' Bank Accounts are maintained at JP Morgan Chase Bank, an authorized financial institution for opening DIP Accounts. A list of the Debtors' Bank Accounts with the amount on deposit as of the Petition Date is attached to the Motion as <u>Exhibit A</u> and described in detail below.

36. Debtor Grandparents.com, Inc. maintains an operating account ending in 5150 (the "<u>Linked Operating Account</u>") and Debtor Grand Card, LLC maintains an operating account ending in 8598. In addition, non-debtor affiliated entities, Grandparents Insurance Solutions, LLC maintains an operating account ending in 1381 and American Grandparents Association, LLC maintains an operating account ending in 5251. All four of the aforementioned operating accounts are linked to the Linked Operating Account wherein inter-company transfers can be made between all operating accounts on the one hand and the Linked Operating Account on the other hand.

37. The Debtors make one monthly, automatic ACH payment to Hewlett-Packard in the amount of $312.88.

38. Steve Leber and Lee Lazarus are the sole individuals with authority to sign checks on any of the aforementioned accounts. Steve Leber, Lee Lazarus, and Elena Fries, collectively are authorized to transfer funds and issue any electronic wires related to any of the accounts detailed herein.

39. By this Motion, and pursuant to section 105(a) of the Bankruptcy Code, the Debtors seek (i) an extension of 60 days from the Petition Date to come into compliance with section 345(b) of the Bankruptcy Code; and (ii) approval of the form and manner in which they deposit and invest funds in accordance with their existing cash management policies. As discussed above, the Bank Accounts are maintained with JP Morgan Chase, a leading financial institution that is financially stable and an approved DIP financial institution. Consequently, an extension of time to determine any actions necessary to comply with Section 345(b)'s investment guidelines should pose no risk to the Debtors' estates or their creditors.

## DEBTORS' OBJECTIVES IN THESE CASES

40.     The primary purposes of the filing of these Chapter 11 Cases is to, among other things: (a) continue the Debtors' operations while in Chapter 11 with as little disruption as possible; (b) allow the Debtors to continue serving their valued customers and operate their businesses pending a restructuring of their debt, and (c) establish procedures for the smooth and efficient administration of these cases.  Through the motions described above and other motions and applications the Debtors may file later, the Debtors hope to minimize any adverse effects that these Chapter 11 Cases might otherwise have on their business and their customers.  For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

41.     This concludes my declaration.

### 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury that the foregoing is true and corrected.  Executed on April 14, 2017.

By: _____
JOSHUA RIZACK