UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

GRANDPARENTS.COM, INC.,                                   Case No. 17-14711-LMI
GRAND CARD LLC,                                           Case No. 17-14704-LMI

    Debtors.[1]                                          (Joint Administration Pending)

_____/

**DEBTORS' EMERGENCY MOTION FOR ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 AND
FED. R. BANKR. P. 2002, 6004, 6006 AND 9014
APPROVING BIDDING PROCEDURES,  FORM AND MANNER
OF SALE NOTICES AND  SCHEDULING SALE HEARING DATE**

**(EMERGENCY HEARING REQUESTED FOR
EARLIEST AVAILABLE DATE AND TIME AFTER APRIL 17, 2017)**

The Debtors submit that a hearing on this Motion is necessary on an emergency "first day" basis enabling the debtors to obtain Qualified Bids in the next 30 days and schedule an auction in the next 45 to 50 days because the Debtors will have no funds to operate after that time.  The Debtors' estates will be irreparably harmed if the assets of the operating debtor, Grandparents.com, Inc., cannot be sold as an ongoing concern together with the assets of its related debtor, prior to Grandparents.com, Inc. being forced to close in 50 to 60 days because it has no funds to operate.

GRANDPARENTS.COM, INC. ("GP") and GRAND CARD LLC ("Grand Card" and collectively with GP, the "Debtors"), by and through undersigned counsel and pursuant to Sections 105, 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, 6006, and 9014, seek entry of an order approving (A) bidding procedures and stalking horse bidder, (B)

---

[1] The address and the last four digits of the taxpayer identification of each of the debtors: (i) Grandparents.com, Inc., 589 8th Avenue, 6th Floor, New York, NY 10018 (1114) and (ii) Grand Card LLC, 10800 Biscayne Boulevard, Suite 750, Miami, FL 33161 (3030).

form and manner of sale notices, and (C) scheduling a sale hearing date (the "Motion") and in support hereof respectfully states as follows:

## I.    JURISDICTION

1.    Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this District pursuant to 28 U.S.C. § 1408.

## II.    BACKGROUND

2.    On April 14, 2017 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

3.    The Debtors are operating their businesses and managing their affairs as debtors in possession. 11 U.S.C. §§ 1107(a) and 1108. As of the date of the filing of this Motion, no creditors' committee has been appointed in these bankruptcy cases.

4.    The Debtor's operations are also discussed in the First Day Declaration of Joshua Rizack which is incorporated herein by reference.  (ECF No. 4).

## III.    RELIEF REQUESTED AND BASIS FOR REQUEST

### A.    Proposed Bidding Procedures

5.    The Debtors respectfully request that the Court approve expedited bidding procedures at a preliminary hearing no later than April 24, 2017 ("Bidding Procedures") in connection with the sale of the assets described in **Exhibit "A"** hereto with a sale hearing pursuant to Section 363 ("Sale Hearing") to occur within 45 to 50 days enabling the debtor, GP, to be sold as an ongoing concern together with the assets of the related debtor and certain non-debtor subsidiaries.

The key proposed bidding procedures are as follows**:**

- **Qualified Bidder:**  Any person or entity expressing an interest in purchasing the Debtors' assets (a "Potential Bidder") must provide the Debtors with  an executed confidentiality agreement in form and substance satisfactory to the Debtors and shall deliver the following Required Supporting Materials and Good Faith Deposit prior to the Bid Deadline which shall constitute its "Bid" to the Debtors and counsel as follows:

  Debtors:

  Grandparents.com, Inc.
  Attn:  Joshua Rizack
  606 Post Road East, 614
  Westport, CT 06880

  with a copy to:

  Steven R. Wirth, Akerman, LLP, Attorneys for Debtors
  Akerman LLP
  401 East Jackson Street, Suite 1700
  Tampa, FL 33602
  steven.wirth@akerman.com

- **Required Supporting Materials:**

  i)   **Executed APA**:  An executed asset purchase agreement in the same form and having the same terms as the APA and reflecting a minimum purchase price $2,100,000 (the "Topping Bid"), together with a markup or redline copy of the Potential Bidder's asset purchase agreement comparing same to the APA and reflecting any deviations from the APA.  All consideration paid to acquire the Purchased Assets shall be for cash, with no financing contingencies.

  ii)  **Proof Ability to Close**:  All Potential Bidders must include as part of any bid appropriate evidence that demonstrates to the reasonable satisfaction of the Debtors that such bidder has the financial ability to consummate the transactions contemplated by their APA by the Closing Date including bank statements and financial statements.  No Potential Bidder shall be entitled to bid and deemed to a Qualified Bidder unless the Debtors determine in their reasonable discretion that the Potential Bidder is financially qualified; provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash  portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such bid. **The Potential Bidder shall also provide a copy of a board resolution or similar document demonstrating the authority of the**

**Potential Bidder to make a binding and irrevocable bid on the terms proposed.**

iii)   **Assumption of Executory Contracts and Unexpired Leases:**  To the extent that the Potential Bidder proposes to include in its bid and the APA the assumption and assignment of any of  the Debtors' executory contracts or unexpired leases, a schedule shall be attached to the APA showing such contracts or leases to be assumed and assigned together with evidence of the Potential Bidder's ability to provide adequate assurance of future performance of such contracts, such as audited financial statements of the Potential Bidder, information regarding the capitalization of the Potential Bidder, information allowing the Debtors to evaluate the value of any guaranties being provided by affiliates of a Potential Bidder of its obligations under any assumed and assigned executory contracts or leases (the "Adequate Assurance Package").

iv)   **Good Faith Deposit:**  A Potential Bidder must deliver with its Bid a good faith deposit equal to 10% of the bid's proposed purchase price in the form of a wire transfer or certified or cashier's check (the "Good Faith Deposit") payable to the trust account for the attorneys for the Debtors.

**A Potential Bidder satisfying the above requirements shall be deemed to be a Qualified Bidder and to have submitted a "Qualified Bid".**

**THE BID DEADLINE SHALL BE May 31, 2017 AT 5:00 P.M. EST.**

**Auction.**  An auction (the "Auction") of the Assets shall be conducted by the Debtors in the event there is at least one Qualified Bidder.  The Auction shall take place at June 2, 2017 at 10:00 a.m. EST at the law offices of Akerman LLP, Three Brickell City Centre, 98 Southeast Seventh Street, Suite 1100, Miami, FL 33131.

**Final Sale Hearing.**  To the extent necessary, a Final Sale hearing shall be conducted by the Court on June 2, 2017 at 2:00 p.m.

**ONLY A QUALIFIED BIDDER WHO HAS SUBMITTED A QUALIFIED BID WILL BE ELIGIBLE TO PARTICIPATE AT THE AUCTION.**

**The Qualified Bidder is not entitled to any break-up fee, termination fee or similar type of payment or reimbursement.**

**Bidding Increment.**  The minimum bidding increment at the auction shall be $100,000 or such other amount as the Debtors determine is appropriate.  The Debtors reserve the right to change the bidding increments at the Auction.

**Baseline Bid / Overbid Protection.**  In the event there are one or more Qualified Bidders and an Auction is held, the Baseline Bid will be the sum of the Qualified Bid which proposes the highest and best economic consideration to the Debtors in the Debtors' sole business judgment.

**Acceptance of Qualified Bid**. The Debtors presently intend to consummate the sale with the Stalking Horse Bidder if there is no Auction. Otherwise, if an Auction is held the Debtors shall determine who has made the highest and best offer (the "Successful Bidder") and the Debtor is authorized to accept Back-Up bids. However, the Debtors' presentation to the Bankruptcy Court for approval of the bid made by the Successful Bidder does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted such Bid only when such bid has been approved by order of the Bankruptcy Court.

**Reservation of Rights.** At the conclusion of the Auction the Debtors shall determine which bid, if any, is the highest or otherwise best offer, and (i) may reject at any time, any bid that the Debtors determine in their sole discretion to be: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the sale transaction, or (c) contrary to the best interests of the Debtors, their estates and creditors.

**Return of Deposits**. The Good Faith Deposit of a Qualified Bidder shall be returned within three business days of the earlier of (a) the closing of a sale transaction on all or a portion of the Assets on which the Qualified Bidder made a bid or (b) 30 days after the Sale Hearing.

**Credit Bidding.** The Stalking Horse (defined below) may credit bid at the sale in an amount up to amount owed the Stalking Horse under its DIP Loan with the Debtor plus the amount outstanding on its first priority prepetition loan to the Debtor. Other creditors may credit bid as permitted under the Code, however credit bids of junior lienors will need to include cash bids to satisfy the any senior liens.

6.      Subject to Court approval, the Debtors have entered into an asset purchase agreement (the "APA") dated as of April 14, 2017 between the Debtors as sellers and VB Funding, LLC[2], as buyer (the "Stalking Horse" or "Stalking Horse Bidder"), providing for the Debtors to sell and the Stalking Horse to purchase the assets listed on Exhibit A (the "Purchased Assets") for a credit bid of $2,000,000.00. The APA has no financial contingencies. A true and correct copy of the APA is attached hereto and incorporated herein as **Exhibit "B"**. The APA does not include a break-up fee.

---

[2] As set forth in the contemporaneously filed Debtors' Emergency Motion for Interim and Final Orders (1) Authorizing the Debtors to Obtain Secured Credit and Use Cash Collateral, (II) Granting Limited Stay Relief for the Lender to Perfect Post-Petition Loan, and (III) Scheduling Final Hearing (the "DIP/Cash Collateral Motion"), VB Funding, LLC is also the Debtors' pre-petition lender and providing the Debtors (subject to Court approval) debtor-in-possession financing and use of cash collateral as more particularly described in the DIP/Cash Collateral Motion.

7.      Further, the Stalking Horse should have a valid, unavoidable first position security interest ($9,827,621.96) in all of the Debtors' assets and has the absolute right to Credit Bid.

8.      The APA does seek a release of the winning bidder from certain successor liability claims, including specifically claims under Chapter 5 of the Bankruptcy Code (the "Successor Liability Release").

9.      The Bidding Procedures are intended to provide a flexible process allowing the Debtors to maximize the value of their assets given the severe liquidity constraints they currently face. The Debtors expressly reserve the right to modify the relief requested in this Motion prior to or at the applicable hearings, including modifying the proposed Bidding Procedures. Moreover, the Debtors reserve the right to adjourn the Auction or the Sale Hearing or remove any assets from the sale if the Debtors determine that such action will maximize value to their estates.

**C.      The Sale Terms Were Negotiated in Good Faith**

10.      Although the Bankruptcy Code does not define "good faith purchaser", courts, in construing section 363(m), have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'". *In re Abbott's Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Vanguard Oil & Serv. Co.*, 88 B.R. 576, 580 (E.D.N.Y. 1988).

11.      The APA is the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse and is on commercially reasonable terms. The Debtors and the Stalking Horse, and their respective professionals, negotiated the terms of the Agreement over the course of several weeks. Further, while the Stalking Horse is a significant shareholder of the

GP (holding approximately 44.5% of GP's common stock), it does not hold any seats on GP's board of directors, nor does it have any control over the Debtors' management, and therefore, all negotiations were undertaken in good faith and in compliance with the Bankruptcy Code. Accordingly, the Debtors request a finding that the transaction contemplated by the APA is (a) subject to the protections afforded to "good faith" purchasers under section 363(m) of the Bankruptcy Code, and (b) not subject to avoidance under section 363(n) of the Bankruptcy Code.

### D.    Proposed Shortened Notice of the Sale Hearing

12.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the hearing on this Motion seeking approval of the sale of the Purchased Assets.  The notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested. However, pursuant to Federal Rule of Bankruptcy Procedure 9006(c), the Court has the authority to limit that notice period based on cause shown. Because of the exigent circumstances facing the Debtors, the Debtors submit that cause exists for the shortened notice period requested herein and thus are seeking to have the Court approve the relief sought herein on the limited notice  requested.  In any event, parties with standing will have an opportunity to object at the final sale hearing (the "Sale Hearing").

13.    The Debtors have served, or will serve, this Motion on: (a) the Office of the United States Trustee; (b) counsel to the pre-Petition and DIP Lenders; (c) those creditors holding the 20 largest unsecured claims against the Debtors' estate; (d) all parties known to be asserting a lien in the Debtors' assets; (e) all counterparties to executory contracts and unexpired leases potentially to be assumed and assigned; (f) all state attorney generals in states where the Debtors conduct business; and (g) various federal and state tax authorities, including the Internal

Revenue Service; (h) the Securities and Exchange Commission, and (i) counsel to any Committee which may be formed.

14.     The Debtors also will serve by regular mail, email and facsimile on the foregoing persons  a notice of the Auction and the Sale Hearing (the "<u>Auction and Hearing Notice</u>"), which includes, among other things, the date, time and place of the Auction and the Sale Hearing and information for how to learn about the deadline for filing any objections to the relief requested herein once they are set by the Court, and, therefore, complies with Bankruptcy Rule 2002(c). The Auction and Hearing Notice will be served on all creditors of the Debtors prior to the bid procedures hearing on this Motion.

15.     The Debtors submit that the methods of notice described in this Motion comply fully with Bankruptcy Rule 2002 in terms of the form of notice required and submit that the exigencies presented by the facts and circumstances of the case necessitate and therefore justify the limited notice period for the proposed Bidding Procedures and the sale of the Purchased Assets.  Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

## V.    SALE OF THE DEBTORS' ASSETS IS WARRANTED PURSUANT TO SECTION 363 OF THE CODE.

16.     The Bankruptcy Code provides that a debtor in possession may sell property of its estate outside of the ordinary course of its business, subject to the approval of the court after notice and a hearing. *See* 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor. *See Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d

380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such action.").

17.    Courts typically consider four factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was given to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good faith. *See*, *e.g., In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

18.    Here, each of these four factors has been satisfied. First, sound business reasons exist for the Debtors' efforts to sell their assets. The Debtors currently have inadequate liquidity to continue operating their website and other business operations for an extended period. A rapid, but orderly sale of the Assets will minimize the liquidity the Debtors need to continue operations while providing a way for the Debtors to monetize their assets for the benefit of its creditors. Second, as discussed above, the Debtors will be providing adequate and reasonable notice to interested parties of the opportunity to bid on the Purchased Assets and of the opportunity to object to the sale of those assets. *See*, *e.g.*, *Folger Adam Security Inc. v. DeMatteis/MacGregor*, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it includes "the time and place of any public sale, the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property"). Third,

the proposed Bidding Procedures provide for an open and competitive bidding process for the Purchased Assets. Fourth, the Debtors are proceeding in good faith and will make a showing at the Sale Hearing that the purchaser or purchasers of the Purchased Assets have acted in good faith. Accordingly, the Auction and sale of the Purchased Assets pursuant to the proposed Bidding Procedures should be approved.

## VI.    SALE OF ASSETS FREE AND CLEAR OF CERTAIN LIENS, CLAIMS AND ENCUMBRANCES.

19.    Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property under Bankruptcy Code Section 363(b) free and clear of liens, claims and encumbrances if one of the following conditions is satisfied: (i) applicable nonbankruptcy law permits the sale of the property free and clear of such interest; (ii) the entity holding the lien, claim or encumbrance consents to the sale; (iii) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 U.S.C. § 363(f). *See In re Smart World Tech., LLC*, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests. It thus allows purchasers ... to acquire assets [from a debtor] without any accompanying liabilities"); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

20.    To facilitate the sale of the Purchased Assets, the Debtors request that the Court authorize their sale free and clear of liens, claims, encumbrances, and other interests (collectively, "Liens") at the Sale Hearing to be scheduled in 45 to 50 days and immediately after the proposed Auction Date for the purpose of hearing, pursuant to Section 363 of the Code, the

Debtors request to sell their Purchased Assets free and clear of liens. The sale of the Purchased Assets pursuant to the Bidding Procedures will have satisfied at least one of the prongs of Section 363(f).

21.    The Debtors believe that Section 363(f)(5) is satisfied because (i) any entity holding a lien on the Purchased Assets could be compelled to accept a monetary satisfaction of its liens, and (ii) the Debtors propose that any lien on the Purchased Assets sold shall attach to the net proceeds of the sale of the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto. As such, the sale of the Purchased Assets free and clear of all liens satisfies Section 363(f)(5) of the Bankruptcy Code.

22.    In addition, the Debtors submit that their assets may be sold free and clear of all successor liability claims. Notwithstanding reference to the conveyance free and clear of "any interest" in Section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment discrimination and rights under travel voucher program); *Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), aff'd, 805 F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(1) barred successor liability for products defect claim).

## VII.    THE COURT SHOULD WAIVE OR REDUCE THE PERIODS REQUIRED BY RULES 6004(H) AND 6006(D) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

23.    Pursuant to Rule 6004(h) (formerly Rule 6004(g)) of the Bankruptcy Rules), all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless the court orders otherwise. Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing

the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).

24.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, a leading treatise suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately if there is a showing of a sufficient need to close the sale within the 14-day period. 10 Collier on Bankruptcy § 6004.10 (15th ed. 2007).

25.    In light of the Debtors' severe liquidity restraints and to limit the costs of administering the Debtors' estates, it is critical that the Debtors close the sale of the Assets as soon as possible, otherwise the potential for a going concern sale and distributions to creditors could be lost.

26.    Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## VIII.   ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Assignment of Unexpired Leases and Executory Contracts.

27.    The assumption and assignment of the Debtors' executory contracts and unexpired leases is an integral part of the proposed sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). By enacting section 365(a) of the Bankruptcy Code, Congress

intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *Leland v. Gardinier, Inc.* (*In re Gardinier, Inc.*), 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *Chira v. Saal (In re Chira)*, 367 B.R. 888, 898 (S.D. Fla. 2007); *In re Sandman Assocs., LLC*, 251 B.R. 473, 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not").

28.     It is well-established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor. *See Gardinier, Inc.*, 831 F.2d at 976 n.2; *Chira*, 367 B.R. at 898; *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) (noting that "[i]n determining whether a debtor may be permitted to reject an executory contract, courts usually apply the business judgment test. Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business judgment will not be altered") (citations omitted); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Sharon Steel Corp. v. National Fuel Gas Dist. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989). Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

29.     Adequate business justification exists to merit judicial approval of the proposed assumption and assignment of the Debtors' executory contracts and unexpired leases. The

Debtors' contracts and leases are valuable assets of the Debtors' estates and represent an integral part of any proposed transaction for the sale of the Purchased Assets. To the extent that the Debtors can sell them as part of the sale, the sales will generate cash which the estates can use to satisfy claims and reduce potential claims against the estates.

30.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign an executory contract if the Debtor:

> (A) cures, or provides adequate assurance that [it] will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease. . . . (f)(2) The trustee may assign an executory contract or unexpired lease of the debtor only if — (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*See* 11 U.S.C. §§ 365(a), (b)(1), (f)(2).

31.     Accordingly, section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments of executory contracts and unexpired leases, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided.

32.     It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance. *See, e.g.*, *In re Glycogensys,*

*Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee"); *Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (same). As set forth above, any bid that is conditioned upon the assumption and assignment of executory contracts and unexpired leases must (a) be submitted with Adequate Assurance Packages containing the identity of such contracts and leases and provide evidence of such bidder's ability to provide adequate assurance of future performance.

33.     The Debtors will provide all parties to executory contracts and unexpired leases to be assumed and assigned pursuant to the Motion with such Adequate Assurance Packages and an opportunity to be heard, and in connection with the Sale Hearing, the Debtors will provide evidence that all requirements for the assumption and assignment of the executory contracts and unexpired leases proposed to be assigned to the purchaser(s) of the assets will be satisfied. Thus, the Debtors respectfully submit that, by the conclusion of the Sale Hearing, assumption and assignment of the executory contracts and unexpired leases should be approved.

### B.     Procedures Regarding Cure Amounts.

34.     To facilitate the sale and the assumption and assignment of the Debtors' executory contracts and unexpired leases, the Debtors propose to serve a notice of assumption and assignment and of the proposed cure amounts relating to such assumed agreements ("Assumed Agreements") no later than seven (7) days after the entry of an Order approving this Motion and request that the Court approve the following procedure for fixing any cure amounts owed on all Assumed Agreements.

35.     The Debtors will attach to the Assumption Notice their calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all prepetition defaults under all Assumed Agreements (the "Prepetition Cure Amount"). The Debtors request that if a non-debtor party to any Assumed Agreements disputes the Prepetition Cure Amount or objects to the assumption and/or assignment of an Assumed Agreements that such party be required to file an objection (the "Cure Amount Objection") on or before 4:00 p.m. (prevailing Eastern Time) three (3) days prior to the Sale Hearing (the "Cure Objection Deadline") and serve a copy of the Cure Amount Objection so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) the Debtors, c/o Joshua Rizack, Chief Restructuring Officer for Debtors, 606 Post Road East, 614, Westport, CT 06880; (ii) attorneys for the Debtors, Steven R. Wirth, Esq., Akerman LLP, 401 East Jackson Street, Suite 1700, Tampa, FL 33602.

36.     In the event any such party fails to timely file and serve a Cure Amount Objection by the Cure Objection Deadline, such party shall (i) be forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts with respect to such Assumed Contracts and Assumed Leases and the Debtors shall be entitled to rely solely upon the Prepetition Cure Amount; and (ii) be deemed to have consented to the assumption and assignment of such Assumed Agreements and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or any other assignee of the relevant Assumed Agreements that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Assumed Agreements.

37.     In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (i) the basis for the objection, and (ii) the amount the party asserts as the Prepetition Cure Amount. After receipt of the Cure Amount Objection, the Debtors will attempt

to reconcile any differences in the Prepetition Cure Amount believed by the non-debtor party to exist. In the event, however, that the Debtors and the non-debtor party are unable to consensually resolve the Cure Amount Objection, the Debtors will segregate any disputed Prepetition Cure Amount pending the resolution of any such disputes by this Court or mutual agreement of the parties.

38.     Based on the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the assumption and assignment of the Assumed Agreements.

## IX.    NOTICE

39.     On an expedited basis, notice of this Motion has been given to (a) the Office of the United States Trustee, (b) all other parties known to be asserting a lien in the Debtors' assets, (c) the 20 largest unsecured creditors of the Debtors, (d) all counterparties to executory contracts and leases that may be assumed and assigned, (e) all state attorney generals in states where the Debtors conduct business, (f) various federal and state tax authorities, including the Internal Revenue Service, and (g) the Securities and Exchange Commission.

40.     Based on the exigent circumstances described above, the Debtors respectfully submit that such notice is sufficient and request that this Court find that no further notice of the relief requested herein is required.

41.     In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

<u>CONCLUSION</u>

For all the foregoing reasons, the Debtors respectfully request the Court grant the relief requested in this Motion in all respects, including entry of an Order in the form attached hereto as **<u>Exhibit C</u>**, granting this Motion and approving the Bid Procedures, Form and Manner of Sale

Notices, and Scheduling a Sale Hearing Date, and granting such other and further relief as the Court deems just and proper.

Dated:  April 14, 2017                          Respectfully submitted,

                                                AKERMAN LLP

                                                By: */s/ Steven R. Wirth*
                                                Steven R. Wirth
                                                Florida Bar No.: 170380
                                                Email: steven.wirth@akerman.com
                                                401 E. Jackson St., Suite 1700
                                                Tampa, FL  33602
                                                Telephone: (813) 223-7333
                                                Facsimile: (813) 223-2837

                                                    and

                                                Eyal Berger
                                                Florida Bar No.: 011069
                                                Email: eyal.berger@akerman.com
                                                350 East Las Olas Blvd., Suite 1600
                                                Ft. Lauderdale, FL 33301
                                                Telephone: (954) 712- 6071
                                                Facsimile: (954) 847-5374

                                                *Proposed Attorneys for Debtors*

# EXHIBIT A

## Assets[1]

The Assets include: of Seller's right, title and interest in and to the following assets:

(a)      all Uniform Resource Locators (and all of the contents of such Uniform Resource Locators);

(b)      all membership interests in American Grandparents Association LLC, a Florida limited liability company;

(c)      all membership interests in Grandparents Insurance Solutions LLC, a Florida limited liability company

(d)      all Assumed Contracts, and all rights and benefits thereunder;

(e)      all Intellectual Property Rights, together with all rights to collect royalties, products and proceeds in connection therewith, all rights to sue and bring other claims for past, present and future infringement, misappropriation or other violation of any of the foregoing, and all rights to recover damages (including attorneys' fees and expenses) or lost profits in connection therewith;

(f)      all marketing information, marketing research and data and customer and mailing lists and all promotional and advertising materials, whether existing in print, video, online, magnetic or other media, and all stationery, forms, labels and other similar materials;

(g)      originals or copies of all books, records, ledgers, files, reports, accounts, data, plans, minute-books and operating records, whether in hard copy, electronic format, magnetic or other media, in any case, used in connection with the Purchased Assets ("***Books and Records***");

(h)      all Permits; and

(i)      to the extent not included in the previous paragraphs, all of the following property of the Sellers (with terms in this paragraph having the same definitions as in the New York Uniform Commercial Code): goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles).

---

[1] Defined terms are incorporated from the Asset Purchase Agreement attached to the Motion as Exhibit B.

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**GRANDPARENTS.COM, INC.,**

**GRAND CARD, LLC**

**AND**

**VB FUNDING, LLC**

**Dated as of April 14, 2017**

**Exhibit B**

# TABLE OF CONTENTS

<b>Page</b>

ARTICLE I DEFINITIONS .................................................................. 1

  1.1    Defined Terms ................................................................ 1
  1.2    Interpretation ................................................................. 7

ARTICLE II SALE AND PURCHASE OF ASSETS ................................ 8

  2.1    Purchase and Sale of Assets ........................................... 8
  2.2    Excluded Assets ............................................................. 8
  2.3    Liabilities; Excluded Assets ........................................... 8
  2.4    Purchase Price ............................................................... 8
  2.5    Closing ......................................................................... 9
  2.6    Closing Deliveries ......................................................... 9

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ................. 9

  3.1    Organization and Standing ............................................ 10
  3.2    Authorization; Non-contravention; Consents ................. 10
  3.3    Liens; Good and Marketable Title .................................. 10
  3.4    Intellectual Property ...................................................... 11
  3.5    Insurance ...................................................................... 12
  3.6    Contracts and Agreements ............................................. 12
  3.7    Claims and Litigation; Orders ....................................... 12
  3.8    Compliance with Laws; Permits .................................... 12
  3.9    Ownership of Subsidiaries ............................................. 13
  3.10  Brokers' and Finders' Fees ............................................ 13
  3.11  Service of Bankruptcy Documents ................................. 13

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ................ 13

  4.1    Organization and Standing ............................................ 13
  4.2    Authorization; Non-contravention; Consents ................. 13
  4.3    No Other Representations; Investigation by Buyer .......... 14

ARTICLE V COVENANTS ............................................................... 14

  5.1    Management until the Closing ....................................... 14
  5.2    Access to Information; Retention of Information; Confidentiality .......... 15
  5.3    Approvals and Consents ................................................ 15
  5.4    Ancillary Agreements ................................................... 16
  5.5    Further Assurances ....................................................... 16

ARTICLE VI CONDITIONS TO THE OBLIGATIONS OF BUYER .................. 16

  6.1    Sale Order ..................................................................... 16
  6.2    Bankruptcy Court Orders .............................................. 16
  6.3    Representations and Warranties ..................................... 17
  6.4    Covenants ..................................................................... 17
  6.5    Certificate ..................................................................... 17
  6.6    No Order; No Litigation ................................................. 17

**Exhibit B**

6.7     Assumption and Assignment of Contracts ................................................. 17
6.8     Ancillary Agreements ................................................................................. 17

ARTICLE VII CONDITIONS TO SELLER'S OBLIGATIONS ................................ 17

7.1     Bankruptcy Court Orders ........................................................................... 17
7.2     Representations and Warranties ................................................................. 17
7.3     Covenants .................................................................................................... 18
7.4     Certificate .................................................................................................... 18
7.5     No Order; No Litigation .............................................................................. 18
7.6     Ancillary Agreements ................................................................................. 18

ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER ....................... 18

8.1     Termination ................................................................................................. 18
8.2     Procedure Upon Termination ..................................................................... 19
8.3     Effect of Termination .................................................................................. 19

ARTICLE IX BANKRUPTCY COURT MATTERS ............................................... 20

9.1     Sale Order ................................................................................................... 20

ARTICLE X TAX MATTERS .................................................................................... 20

10.1    Transfer Taxes ............................................................................................ 20
10.2    Bulk Sales Laws .......................................................................................... 20

ARTICLE XI MISCELLANEOUS ............................................................................. 21

11.1    Specific Enforcement ................................................................................. 21
11.2    Survival ....................................................................................................... 21
11.3    Indemnification ........................................................................................... 21
11.4    Notices ......................................................................................................... 21
11.5    Governing Law ............................................................................................ 22
11.6    Severability .................................................................................................. 22
11.7    Counterparts ................................................................................................ 23
11.8    Public Announcement ................................................................................. 23
11.9    Expenses ...................................................................................................... 23
11.10   Binding Effect; Assignment ....................................................................... 23
11.11   Consent to Jurisdiction; Waiver of Jury Trial ........................................... 23
11.12   Amendment; Waiver .................................................................................... 24
11.13   Entire Agreement ........................................................................................ 24

111072717.7

**Exhibit B**

**EXHIBITS**

Exhibit A            Form of Assignment and Assumption Agreement

Exhibit B            Form of Bill of Sale

Exhibit C            Form of Patent Assignment Agreement

Exhibit D            Form of Trademark Assignment Agreement

Exhibit E            Form of Sale Order

**SCHEDULES**

Schedule 3.2         Required Consents

Schedule 3.4         Intellectual Property Rights

Schedule 3.6         Assumed Contracts

Schedule 3.8         Permits

**Exhibit B**

**THIS ASSET PURCHASE AGREEMENT**, dated as of April 14, 2017, by and among **GRANDPARENTS.COM, INC.,** a Delaware corporation ("*GP*"), and **GRAND CARD, LLC**, a Florida limited liability company ("*GC*", and together with GP, "*Seller*"), and **VB FUNDING, LLC**, a Delaware limited liability company ("*Buyer*").

WITNESSETH:

WHEREAS, Seller is a membership organization and social media community that owns and operates the Grandparents.com website and owns or has the right to use all of the Purchased Assets;

WHEREAS, Seller wishes to sell to Buyer the Purchased Assets, and Buyer wishes to purchase from Seller all of the Purchased Assets, all on the terms and subject to the conditions set forth herein;

WHEREAS, Seller has commenced cases under chapter 11 of title 11 (the "*Chapter 11 Cases*") of the United States Code, 11 U.S.C. § 101 et seq. (the "*Bankruptcy Code*"), on April 14, 2017 (the "*Petition Date*") in the United States Bankruptcy Court for the Southern District of Florida, Miami Division (the "*Bankruptcy Court*"); and

WHEREAS, in connection with the Chapter 11 Cases and on the terms and subject to the conditions contained in this Agreement and following entry of the Sale Order (as defined herein), Seller shall sell, transfer and assign to Buyer, and Buyer shall purchase and acquire from Seller, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made herein and of the mutual benefits to be derived herefrom, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

ARTICLE I

DEFINITIONS

1.1     Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below (each such meaning to be equally applicable to both the singular and plural forms of the respective terms so defined).

"*Acquisition Proposal*" means a proposal (other than by Buyer or its Affiliates) relating to any sale, transfer or other disposition of all or any substantial portion of the Purchased Assets to one or more Persons (other than Buyer or its Affiliates) however proposed to be effected.

"*Affiliate*" means, with respect to any specified Person, any Person directly or indirectly Controlling or Controlled by, or under direct or indirect common Control with, such specified Person.

{41465722;1}111072717.7

**Exhibit B**

"***Agreement***" means this Asset Purchase Agreement, as amended, modified or supplemented from time to time in accordance with the terms hereof.

"***Ancillary Agreements***" means the Assumption Agreement, Bill of Sale, Patent Assignment Agreement, Trademark Assignment Agreement, and the other agreements, instruments and documents required to be delivered at the Closing hereunder.

"***Assumed Contracts***" means those contracts listed on Schedule 3.6.

"***Assumption Agreement***" means the Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit A.

"***Avoidance Actions***" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

"***Bankruptcy Code***" has the meaning specified in the Recitals.

"***Bankruptcy Court***" has the meaning specified in the Recitals.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure.

"***Bill of Sale***" means the Bill of Sale substantially in the form attached hereto as Exhibit B.

"***Business Day***" means any day, excluding Saturday, Sunday and any day on which banks in the City of New York, New York are authorized or required by Law or other governmental action to close.

"***Buyer***" has the meaning specified in the Preamble to this Agreement.

"***Causes of Action***" means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases.

"***Chapter 11 Cases***" has the meaning specified in the Recitals.

"***Claim***" means a "***claim***" as defined in section 101 of the Bankruptcy Code.

"***Closing***" has the meaning specified in Section 2.6 hereof.

"***Closing Date***" has the meaning specified in Section 2.6 hereof.

**Exhibit B**

"*Code*" means the Internal Revenue Code of 1986, or any subsequent legislative enactment thereof, as amended and in effect from time to time, including any rules and regulations promulgated thereunder.

"*Consents*" means consents, approvals, authorizations, declarations, filings or registrations with, or notices to, any Governmental Entity or other third party, including any consents required from, or notices required to be delivered to, counterparties to Contracts in connection with any assignment thereof pursuant to the transactions contemplated hereby.   In the case of Contracts, the term "Consent" also means (a) an approval of a contractual counterparty to an amendment or modification to an Assumed Contract, and (b) a consent or approval of a contractual counterparty that is made in connection with an amendment or modification to an Assumed Contract.

"*Contracts*" means all written contracts, purchase or other orders, leases, licenses, commitments, instruments and other agreements to which Seller is a party, and all rights and benefits thereunder.

"*Control*", including, with correlative meanings, "*Controlling*", "*Controlled by*" and "*under common Control*", of a Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities, by contract or otherwise.

"*DIP Lender*" means VB Funding, LLC, Delaware limited liability company, together with its successors and assigns.

"*DIP Loan*" means the loan which is made by the DIP Lender to Seller, as a Chapter 11 debtor, as evidenced by the DIP Loan Documents.

"*DIP Loan Agreement*" means that certain Debtor-in-Possession Credit and Security Agreement, dated as of April 14, 2017 by and between Seller and the DIP Lender.

"*DIP Loan Documents*" means the DIP Loan Agreement and any agreements, documents or instruments executed or delivered in connection therewith, as the same may be amended, modified, supplemented or restated from time to time.

"*DIP Motion*" means GP's and GC's Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtor To Obtain Secured Credit And Use Cash Collateral, (II) Granting Limited Stay Relief For The Lender To Perfect Postpetition Loan And (III) Scheduling Final Hearings [Docket No. ___] dated April 14, 2017.

"*DIP Order*" means the *Final Order (I) Authorizing (A) Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361 and 364(c); (B) Use of Cash Collateral* [Docket No. ____] dated _____.

"*Encumbrance*" means any Lien, encumbrance, Claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive

{41465722;1}3

rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

"***ERISA***" means the Employee Retirement Security Act of 1974, as amended.

"***Existing Loan***" means that certain term loan credit facility evidenced and governed by that certain Amended and Restated Credit Agreement among GP, Buyer and the other lenders a party thereto, dated as of September 15, 2016.

"***Final Order***" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in the Chapter 11 Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for a new trial, re-argument or rehearing shall then be pending or (ii) if an appeal, *writ of certiorari*, new trial re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, re-argument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"***Governmental Entities***" means any foreign, federal, state or local governmental, administrative or regulatory authority, agency or court.

"***GC***" has the meaning specified in the Preamble.

"***GP***" has the meaning specified in the Preamble.

"***Intellectual Property Rights***" means all of the following in any jurisdiction throughout the world, and all corresponding rights, presently or hereafter existing, whether arising by operation of law, contract, license or otherwise:  (a) trademarks or service marks or names, including all trademark or service mark registrations, trade dress, logos, trade names, business names, corporate names, Internet domain names, and all other indicia of origin, together with all applications, registrations, and renewals in connection therewith, and all goodwill associated with any of the foregoing ("***Marks***"); (b) copyrights, copyrightable works and other works of authorship, including applications, registrations, and renewals in connection therewith including all web site content and programming, (c) patent rights, including issued patents, applications, divisionals, continuations, and continuations in part, reissues, reexaminations, patents of additions, utility models and inventors' certificates ("***Patent Rights***"), (d) trade secrets and other proprietary or confidential information, including know-how, processes, methods, techniques, inventions, inventor's notes, drawings and designs, (e) Software, (f) all other proprietary and

**Exhibit B**

intellectual property rights, and (g) all copies and tangible embodiments or descriptions of any of the foregoing (in whatever form or medium.

"*IRS*" means the Internal Revenue Service of the United States of America.

"*Knowledge*" means, when used with respect to Seller, the knowledge of Steve Leber, Lee Lazarus and Joshua Rizack.

"*Law*" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, or other requirement or rule of law of any Governmental Entity.

"*Legal Requirement*" means requirements of all federal, state and local laws, statutes, codes, rules, regulations, ordinances, judgments, determinations, orders, decrees, opinions, writs, injunctions, acts and the like of any Governmental Entity.

"*Liability*" means any claim, debt, liability, obligation or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due), whenever or however arising (including those arising out of any contract or tort, whether based on negligence, strict liability or otherwise), and including all costs and expenses related thereto.

"*Lien*" means any lien, pledge, mortgage, charge, security interest, encumbrance, title retention agreement, claim, option or similar third-party interest or claim.

"*Loss*" has the meaning specified in Section 11.3 hereof.

"*Marks*" has the meaning specified in this Article I.

"*Material Adverse Effect*" means any event, change, development or circumstance that, individually or together with any one or more other events, changes, developments or circumstances, has had or would reasonably be expected to have a material adverse effect on the Seller's ability to transfer and convey the Purchased Assets and otherwise fulfill its obligations under this Agreement.

"*Outside Date*" has the meaning specified in Section 8.1(j) hereof.

"*Owned Software*" means all Software owned by Seller.

"*Patent Assignment Agreement*" means the Patent Assignment Agreement substantially in the form attached hereto as Exhibit C.

"*Patent Rights*" has the meaning specified in this Article I.

"*Permits*" has the meaning specified in Section 3.8 hereof.

**Exhibit B**

"***Person***" means a corporation, association, limited liability company, partnership, organization, trust, unincorporated organization, company, business, individual, government or political subdivision thereof or governmental agency.

"***Petition Date***" has the meaning specified in the recitals.

"***Plan of Liquidation***" means the Joint Plan of Liquidation of Debtors, GP and GC, which will be filed in connection with the Seller's Chapter 11 Cases.

"***Prohibition***" has the meaning specified in Section 6.6 hereof.

"***Purchase Price***" has the meaning specified in Section 2.4 hereof.

"***Purchased Assets***" means all of Seller's right, title and interest in and to the following assets:

(a)     all Uniform Resource Locators (and all of the contents of such Uniform Resource Locators);

(b)     all membership interests in American Grandparents Association LLC, a Florida limited liability company;

(c)     all membership interests in Grandparents Insurance Solutions LLC, a Florida limited liability company

(d)     all Assumed Contracts, and all rights and benefits thereunder;

(e)     all Intellectual Property Rights, together with all rights to collect royalties, products and proceeds in connection therewith, all rights to sue and bring other claims for past, present and future infringement, misappropriation or other violation of any of the foregoing, and all rights to recover damages (including attorneys' fees and expenses) or lost profits in connection therewith;

(f)     all marketing information, marketing research and data and customer and mailing lists and all promotional and advertising materials, whether existing in print, video, online, magnetic or other media, and all stationery, forms, labels and other similar materials;

(g)     originals or copies of all books, records, ledgers, files, reports, accounts, data, plans, minute-books and operating records, whether in hard copy, electronic format, magnetic or other media, in any case, used in connection with the Purchased Assets ("***Books and Records***");

(h)     all Permits; and

(i)     to the extent not included in the previous paragraphs, all of the following property of the Sellers (with terms in this paragraph having the same definitions as in the New York Uniform Commercial Code): goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is

111072717.7

**Exhibit B**

evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles), provided, however, the "Purchased Assets" shall not include any claims Seller may have against its directors and officers.

"***Registered Intellectual Property Rights***" has the meaning specified in Section 3.4(a) hereof.

"***Required Consents***" has the meaning specified in Section 3.2 hereof.

"***Sale Motion***" means the motion or motions of seeking approval and entry of the Sale Order and the transactions contemplated by this Agreement.

"***Sale Order***" means an order in the form attached hereto as Exhibit E and otherwise in form and substance satisfactory to Seller and Buyer.

"***Seller***" has the meaning specified in the Preamble to this Agreement.

"***Software***" means computer programs, including any software implementations of algorithms, tools, applets, models and methodologies, data, databases, compilations and other electronic data files, and all documentation for the foregoing.

"***Tax***" means any federal, foreign, state, county, local and other tax (including income, gross receipts, transfer, excise, property, ad valorem, franchise, license, sales, use, goods and services, value added, withholding, estimated, occupancy, capital, profits, employment, unemployment compensation, payroll related, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto.

"***Trademark Assignment Agreement***" means the Patent Assignment Agreement substantially in the form attached hereto as Exhibit D.

"***Transfer Taxes***" has the meaning specified in Section 10.1 hereof.

"***Transferred Intellectual Property Rights***" means all Intellectual Property Rights included in the Purchased Assets.

   1.2 <u>Interpretation</u>. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in construction or interpretation hereof. References to Articles, Sections, Exhibits, Schedules and Annexes are to Articles, Sections, Exhibits, Schedules, and Annexes of this Agreement unless otherwise specified. Any capitalized terms used in any Exhibit, Schedule or Annex but not otherwise defined therein shall have the meaning set forth in this Agreement. References to "the date hereof" in this Agreement mean the date of this Agreement. Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular. Whenever the words "include", "includes" or "including" are used

**Exhibit B**

in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact following by those words or words of like import.  References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References to any Person include the successors and permitted assigns of that Person.  Each reference in this Agreement to any Legal Requirement will be deemed to include such Legal Requirement as it hereafter may be amended, supplemented or modified from time to time and any successor thereto prior to Closing, unless such treatment would be contrary to the express terms of this Agreement.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  Any reference to "days" means calendar days unless Business Days are expressly specified.  If any action under this Agreement is required to be done or taken on a day that is not a Business Day, then such action shall not be required to be done or taken on such day but on the first succeeding Business Day thereafter.  References to "$" shall mean U.S. dollars.  This Agreement and the Ancillary Agreements shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.  If a word or phrase is defined, the other grammatical forms of such word or phrase have a corresponding meaning.

## ARTICLE II

## SALE AND PURCHASE OF ASSETS

2.1     Purchase and Sale of Assets.

(a)     Purchase of the Purchased Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and upon the terms and subject to the conditions set forth in this Agreement and the Sale Order (which must be a Final Order), Seller shall sell and assign to Buyer, and Buyer shall purchase, at the Closing, all of Seller's right, title and interest in and to all of the Purchased Assets, free and clear of all Liens, Claims and Encumbrances.

2.2     Excluded Assets.  Notwithstanding anything in this Agreement to the contrary, the Purchased Assets shall not include, and Seller and its Affiliates shall retain any and all assets that do not constitute Purchased Assets, including without limitation any and all claims of seller pursuant to Sections 544-550 of the Bankruptcy Code.

2.3     Liabilities; Excluded Assets.  Buyer shall not assume or be responsible for any obligations or Liabilities of Seller or any of its Affiliates, whether related to the Purchased Assets or otherwise.  For purposes of clarity, notwithstanding anything herein to the contrary, Buyer shall not assume and shall not be obligated to pay, perform or discharge any Liabilities or obligations of Seller or its Affiliates.

2.4     Purchase Price.  The purchase price to be paid by Buyer to Seller for the Purchased Assets (the "**Purchase Price**") shall be an amount equal to $2,000,000, which represents all of the debt and accrued interest thereon outstanding under the Existing Loan, which is secured by, among other things, Sellers' right, title and interest in the Purchased Assets, and is being credit bid by the Purchaser.

{41465722;1}8

**Exhibit B**

2.5    <u>Closing</u>.    Subject to the satisfaction of all the conditions set forth in Articles VI and VII or the waiver thereof by the party entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "***Closing***") shall take place remotely via the exchange of electronic copies of documents and confirmation of other matters necessary to consummate the Closing, or at such other time or place as Seller and Buyer may mutually agree in writing, on the date that is no later than fourteen (14) days following the date upon which the Sale Order becomes a Final Order, unless Seller obtains from the Bankruptcy Court a waiver of the stay of the Sale Order provided under Federal Rule of Bankruptcy Procedure 6004(h).  If such waiver of the stay of the Sale Order is obtained, Buyer and Seller may close after the satisfaction of all the conditions set forth in Articles VI and VII, or the waiver thereof by the party entitled to waive the applicable condition, and if Buyer agrees in writing to close on a date later than fourteen (14) days after entry of the Sale Order.  The date on which the Closing occurs is referred to herein as the "***Closing Date.***"  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller in and to the Purchased Assets to be acquired by Buyer hereunder shall be considered to have passed to Buyer shall be considered to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

2.6    <u>Closing Deliveries</u>.  At the Closing:

(a)    Seller shall deliver or cause to be delivered to Buyer:

(i)    counterparts of each Ancillary Agreement to which Seller or one of its Affiliates is a party, duly executed by Seller or the applicable Affiliate;

(ii)    the officer's certificate required to be delivered pursuant to Section 6.5;

(iii)    a true and correct copy of the Sale Order, substantially in the form attached hereto as Exhibit E; and

(iv)    written confirmation from the DIP Lender, in form and substance acceptable to Buyer and Seller, that the DIP Loan has been satisfied in full and all liens and security interests granted under the DIP Loan Documents have been released by the DIP Lender.

(b)    Buyer shall deliver or cause to be delivered to (or at the direction of) Seller:

(i)    counterparts of each Ancillary Agreement to which Buyer is a party, duly executed by Buyer; and

(ii)    the officer's certificate required to be delivered pursuant to Section 7.4.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer (except with respect to any representation or warranty that is made as of a specific date) as follows:

111072717.7

**Exhibit B**

3.1 <u>Organization and Standing</u>. GP is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware. GC is a limited liability company duly incorporated, validly existing and in good standing under the Laws of the State of Florida. Seller (a) has all requisite power and authority to own, lease or license its property and to own the Purchased Assets, and (b) is duly qualified or licensed to do business as a foreign corporation in all jurisdictions where the nature of its business or the properties owned or leased by it makes such qualification or licensing necessary.

3.2 <u>Authorization; Non-contravention; Consents</u>.

(a)     Seller has the requisite corporate and company authority (as applicable) to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement have been, and the execution, delivery and performance of the Ancillary Agreements to which it is a party at Closing will be, duly authorized by all necessary corporate and company action (as applicable) on the part of Seller. This Agreement has been, and each of the Ancillary Agreements to which it is a party when executed by Seller will be, duly executed and delivered by Seller and constitutes, or when executed by Seller will constitute, legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to creditors' rights generally and to general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

(b)     The execution and delivery of this Agreement does not, and the execution and delivery of each of the Ancillary Agreements to which Seller is a party will not, and the performance and consummation by Seller of any of the transactions contemplated herein or therein will not, (i) contravene, conflict with or constitute or result in a breach or violation of, or a default under: (A) the certificate of incorporation or bylaws of GP or the certificate of formation or operating agreement of GC, (B) subject to and assuming entry of the Sale Order, any order of any Governmental Entity applicable to Seller, or (C) any Law applicable to Seller; (ii) result in the creation of a Lien on any Purchased Assets; or (iii) contravene, conflict with or constitute or result in a breach or violation of, or a default under, or create in any party a right to cancel, modify, terminate or accelerate, or require consent or notice pursuant to, any indenture, contract, instrument or other agreement by which Seller is bound.

(c)     No Consent of any Governmental Entity (except the Bankruptcy Court in connection with the Sale Order) or any other Person (including any other Person under an Assumed Contract) is required to be made or obtained by Seller in connection with the execution and delivery of this Agreement or any Ancillary Agreement to which Seller is a party and the performance of the transactions contemplated hereby and thereby, except as may be necessary as a result of any facts or circumstances relating to Buyer or its Affiliates, except as set forth on Schedule 3.2 (the "***Required Consents***").

3.3 <u>Liens; Good and Marketable Title</u>. Seller has good and marketable title to, or in the case of any property held or used under any lease or other Contract, a valid and

111072717.7

enforceable right to use, the Purchased Assets, free and clear of any Liens, Claims and Encumbrances, other than the Liens of Buyer granted pursuant to the Original Loan and DIP Loan.  Upon consummation of the transactions contemplated by this Agreement, Buyer shall receive good and marketable title to the tangible Purchased Assets, free and clear of any Liens, Claims or Encumbrances, other than Liens arising by reason of any action of, or circumstances relating to, Buyer.

3.4     Intellectual Property.

(a)     Schedule 3.4 sets forth a true and complete list of all of the following: (i) issuances, registrations, and applications for Intellectual Property Rights (including Internet domain names) owned by Seller ("**_Registered Intellectual Property Rights_**"), (ii) Owned Software and (iii) licensed software (other than Software licensed under shrink-wrap, click-wrap or browse-wrap agreements with a replacement cost or annual aggregate license, maintenance and subscription fees of under $500).  The Transferred Intellectual Property Rights are valid, subsisting and enforceable, and no patent included in the Transferred Intellectual Property Rights has been misused.

(b)     Seller exclusively owns all right, title and interest in and to, or has a valid and enforceable written license to use, all Intellectual Property Rights, free and clear of all Liens, except as noted on Schedule 3.4.  The transactions contemplated by this Agreement shall not impair the right, title or interest of Seller in or to the Transferred Intellectual Property Rights, and all of the Transferred Intellectual Property Rights shall be owned or available for use by Buyer immediately after the Closing on terms and conditions identical to those under which Seller owned or used the Transferred Intellectual Property Rights immediately prior to the Closing.

(c)     Seller does not infringe, misappropriate or otherwise violate, and has not infringed, misappropriated or otherwise violated, the Intellectual Property Rights of any Person.  No claims are pending, have been asserted in writing against Seller or, to the Knowledge of Seller, have been threatened (i) challenging the validity, enforceability, ownership or use of any Transferred Intellectual Property Rights or (ii) alleging that Seller infringes, misappropriates or otherwise violates the Intellectual Property Rights of any Person (including any unsolicited offers or demands to license any Intellectual Property Rights).  The Transferred Intellectual Property Rights are not subject to any outstanding consent, settlement, decree, order, injunction, judgment or ruling restricting the use or ownership thereof.

(d)     Seller has not asserted any claim of infringement, misappropriation, or other violation against any Person with respect to the Transferred Intellectual Property Rights and, to the Knowledge of Seller, no Person is infringing, misappropriating or otherwise violating any Transferred Intellectual Property Rights.

(e)     Seller has taken all commercially reasonable actions, and all actions customary in it industry, to maintain, protect and enforce the Transferred Intellectual Property Rights, including the secrecy of all trade secrets and other confidential information contained therein.

(f)     Each of Seller's employees, agents, consultants and contractors has entered into written agreements pursuant to which he, she or it (i) agrees to protect the confidential

{41465722;1}11

**Exhibit B**

information relating to the Purchased Assets and (ii) assigns to Seller all Intellectual Property Rights created, authored or developed by such Person in the course of his, her or its employment or other engagement by Seller.

3.5    Insurance.    As of the date hereof, all material property and liability insurance policies covering any of the Purchased Assets are in full force and effect, and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any such insurance policy is not willing or able to perform its obligations thereunder has been received by Seller.  Such policies provide for coverage in amounts deemed by Seller to be adequate, and all premiums due and payable thereon have been paid in full.

3.6    Contracts and Agreements.

(a)    Schedule 3.6 sets forth all Assumed Contracts, which includes all Contracts to which Grandparents Insurance Solutions, LLC and/or American Grandparents Association, LLC are a party.  The Contracts listed on Schedule 3.6 constitute all of the material executory Contracts that are unexpired as of the date hereof relating to the Purchased Assets to which Seller is a party or by which it or any of the Purchased Assets is bound.  By way of clarification, Schedule 3.6 includes Contracts to be assumed indirectly by Buyer through its acquisition of the membership interests in American Grandparents Association LLC, a Florida limited liability company and Grandparents Insurance Solutions LLC, a Florida limited liability company.

(b)    There have been made available to Buyer true and complete copies of each of the Contracts set forth on Schedule 3.6.

3.7    Claims and Litigation; Orders.    There are no actions, suits, charges, complaints, claims, proceedings, orders, judgments or decrees pending or, to the Knowledge of Seller, threatened in writing seeking to prevent or challenging the transactions contemplated hereby, and, to the Knowledge of the Seller, there is no basis for any of the foregoing.  As of the date hereof, the Purchased Assets are not subject to any award, judgment, decree or other order of any court, other than orders entered by the Bankruptcy Court during the pendency of the Chapter 11 Cases.

3.8    Compliance with Laws; Permits.  Seller is in compliance with all Laws of any Governmental Entity which affect the Purchased Assets or to which any Purchased Asset is subject, and no claim has been filed against, nor any notice (formal or informal) given to, Seller alleging a violation of any such Law.  All permits, licenses, certificates, accreditations and other authorizations and approvals from Governmental Entities required for the ownership of the Purchased Assets (collectively, "***Permits***") have been duly obtained and are in full force and effect and are listed on Schedule 3.8.  There are no proceedings before any Governmental Entity pending or, to the Knowledge of Seller, threatened in writing that may result in the revocation, cancellation, suspension or modification of any Permits.  No notices have been received by the Seller alleging the failure to hold any required Permit.  The Seller is in compliance with all terms and conditions of all Permits which it holds.

**Exhibit B**

3.9     Ownership of Subsidiaries.  GP owns 100% of all of the limited liability company membership interests in American Grandparents Association, LLC, a Florida limited liability company and Grandparents Insurance Solutions, LLC, a Florida limited liability company.  All outstanding equity interests in such entities have been validly issued, are fully paid and non-assessable and are owned by GP free and clear of all Liens.

3.10     Brokers' and Finders' Fees.  No agent, broker, investment banker, finder, financial advisor or other Person is or will be entitled to any brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement and the Ancillary Agreements based on any arrangement or agreement made by or on behalf of Seller or their respective Affiliates or to which any of the foregoing entities is subject.

3.11     Service of Bankruptcy Documents.  Seller has appropriately and timely served all parties in interest with copies of the Sale Motion and cure notices.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the date of this Agreement (except with respect to any representation or warranty that is made as of a specific date) as follows:

4.1     Organization and Standing.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

4.2     Authorization; Non-contravention; Consents.

(a)     Buyer has the requisite limited liability company authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement has been, and the execution, delivery and performance of the Ancillary Agreements will be, duly authorized by all necessary limited liability company action on the part of Buyer.  This Agreement has been, and each of the Ancillary Agreements to which Buyer is a party when executed and delivered by Buyer will be, duly executed and delivered by Buyer and constitutes, or when executed and delivered by Buyer will constitute, the legal, valid and binding obligations of Buyer enforceable against it in accordance with their respective terms, except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Laws relating to creditors' rights generally and to general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

(b)     The execution and delivery of this Agreement does not, and the execution and delivery of each of the Ancillary Agreements to which Buyer is a party will not, and the performance and consummation by Buyer of any of the transactions contemplated herein or therein will not, (i) contravene, conflict with or constitute or result in a breach or violation of, or a default under:  (A) the certificate of formation or operating agreement of Buyer; (B) any statute or regulation applicable to Buyer or any order of any court or other Governmental Entity or any

{41465722;1}13

**Exhibit B**

judgment, award or decree to which it is subject; or (ii) result in the creation of a Lien on any of the assets or properties of Buyer or contravene, conflict with or constitute or result in a breach or violation of, or a default under, or create in any party a right to cancel, modify, terminate or accelerate, any indenture, contract, instrument or other agreement by which Buyer is bound, except, in the cases of clauses (i)(B) and (ii) above, where such contravention, conflict, Lien, breach, violation, default or right would not, individually or in the aggregate, impair, restrict or delay the ability of Buyer to consummate the transactions contemplated by this Agreement or the performance by Buyer of any of its material obligations under this Agreement or any Ancillary Agreement or subject Seller to any Liability.

(c)      No Consent of any Governmental Entity is required to be made or obtained by Buyer in connection with the execution and delivery of this Agreement or any Ancillary Agreement and the performance of the transactions contemplated hereby and thereby, except where the failure to obtain such Consent would not impair, restrict or delay the ability of Buyer to consummate the transactions contemplated by, or the performance by Buyer of any of the material obligations under, this Agreement or any Ancillary Agreement.

4.3      <u>No Other Representations; Investigation by Buyer</u>.  Except as expressly set forth in this Article IV, Buyer is not making and each has not made any representation or warranty, express or implied, to Seller or any Affiliate thereof concerning Buyer, as applicable.

ARTICLE V

COVENANTS

5.1      <u>Management until the Closing</u>.

(a)      Except (i) as contemplated by this Agreement or any Ancillary Agreement, (ii) for matters consented to by Buyer in writing in advance (which consent shall not be unreasonably withheld, delayed or conditioned), (iii) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, or (iv) as may otherwise be required by applicable Law, during the period from the date hereof to the Closing Date, Seller will use commercially reasonable efforts to own and operate the Purchased Assets in the ordinary course consistent with past practices.  Without limiting the generality of the foregoing, and except as otherwise contemplated by this Agreement, between the date hereof and the Closing Date, Seller will not, without the prior written consent of Buyer (which consent shall not be unreasonably withheld, delayed or conditioned) or pursuant to an order of the Bankruptcy Court, with respect to the Purchased Assets:

(i)      (A) enter into any contract or agreement that would render Seller's representations in Section 3.6 inaccurate in any way, or (B) except as contemplated by Section 5.3, terminate, modify in any material respect or waive any material right under any Assumed Contract.

(ii)      subject any Purchased Asset to any Liens, other than Liens arising by reason of any action of, or circumstances relating to, Buyer;

111072717.7

**Exhibit B**

(iii)    purchase, sell, transfer, lease, license, exchange, abandon or otherwise dispose of or acquire any Purchased Assets; or

(iv)    agree, whether in writing or otherwise, to do any of the foregoing.

(b)    Nothing contained in this Agreement shall give Buyer, directly or indirectly, rights to control or direct Seller's operation of the Purchased Assets prior to the Closing, and, prior to the Closing, Seller shall, with respect to the Purchased Assets, exercise complete control and supervision of the Purchased Assets, in all cases, consistent with the terms and conditions of this Agreement.

5.2    <u>Access to Information; Retention of Information; Confidentiality</u>.  From the date hereof until the Closing Date, upon reasonable prior written notice and except as determined in good faith to be appropriate to ensure compliance with any applicable Laws and subject to any applicable privileges (including the attorney-client privilege) and legal or contractual confidentiality or privacy obligations, Seller will afford Buyer and its counsel, accountants and other representatives reasonable access, during regular business hours, to the employees and Books and Records; provided, however, that such access will not unreasonably interfere with the normal operations of Seller.  All requests for information made pursuant to this Section 5.2 shall be directed to Seller.  Notwithstanding anything in this Agreement to the contrary, Seller shall not be required, prior to the Closing, to disclose, or cause or seek to cause the disclosure of, to Buyer or their Affiliates or representatives (or provide access to any employees or Books and Records that would reasonably be expected to result in the disclosure to such persons or others of) any confidential information to the extent that such disclosure would violate applicable Law.

5.3    <u>Approvals and Consents</u>.

(a)    Prior to the Closing, upon the terms and subject to the conditions of this Agreement, Seller and Buyer shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done and cooperate with each other in order to do, all things reasonably necessary, proper or advisable (subject to any applicable Laws) to consummate the Closing as promptly as practicable, including the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such other actions as are necessary to obtain any requisite approvals, authorizations, consents, orders, licenses, permits, qualifications, exemptions or waivers by any Governmental Entity.  No party hereto shall take any action after the date hereof that would reasonably be expected to materially delay the obtaining of, or result in not obtaining, any permission, approval or consent from any Governmental Entity required to be obtained prior to Closing.  Nothing contained in this Agreement shall require Seller or Buyer, or any of their respective Affiliates, to pay any consideration, offer or grant any accommodation or other benefit, release any claim or right or subject itself to any Liability to obtain any such permission, approval or consent.

(b)    Notwithstanding the foregoing or anything in this Agreement to the contrary, with respect to the Required Consents disclosed in Schedule 3.2, Seller shall, prior to the Closing, use its best commercially reasonable efforts to obtain such Required Consents, and Buyer shall reasonably cooperate therewith.

{41465722;1}15

**Exhibit B**

(c)     If, prior to Closing, any Required Consent for any Assumed Contract is not obtained and such failure cannot be effectively overridden or cancelled by the Sale Order or other related order of the Bankruptcy Court, such Assumed Contract shall not be assigned; provided, however, that, at the Closing, Buyer shall deliver to Seller a certificate listing all such Assumed Contracts (each, a "***Non-Assigned Contract***") for which during the term of such Assumed Contracts Seller shall not seek to reject the Non-Assigned Contract pursuant to section 365(a) or 1123(b)(2) of the Bankruptcy Code and shall use its best commercially reasonable efforts to keep the Non-Assigned Contract in effect and, consistent with the foregoing, enter into arrangements to deliver to Buyer the benefit of the Non-Assigned Contract to the same extent as if it had been assigned, including using commercially reasonable efforts to preserve any rights under such Non-Assigned Contracts for the benefit of Buyer (it being understood that such efforts shall not include any requirement or obligation of Seller or any of its Affiliates to pay any consideration, offer or grant any financial accommodation or other benefit, release any claim or right or subject itself to any Liability). Nothing in this Agreement shall be construed as an attempt to assign any agreement or other instrument that is by its terms non-assignable without the consent of the other party. From and after the Closing, Buyer shall pay, perform and discharge, in a timely manner and in accordance with the terms thereof, any obligations of Seller or its Affiliates to the extent arising out of, in connection with or relating to any Non-Assigned Contract. From and after the Closing, Buyer shall indemnify, defend, and hold harmless Seller and its Affiliates from any claim of breach under any Non-Assigned Contract, to the extent such breach was made by or at the direction of Buyer.

5.4     Ancillary Agreements.  On the Closing Date, each of Seller, Buyer shall execute and deliver to the other each of the Ancillary Agreements to which it is a party.

5.5     Further Assurances.  Following the Closing, subject to the terms and conditions of this Agreement, if any further action is necessary in order to carry out the purposes of this Agreement, each of the parties will take such further action (including the execution and delivery of such further instruments and documents) as the other party may reasonably request (at the sole cost and expense of the requesting party).

ARTICLE VI

CONDITIONS TO THE OBLIGATIONS OF BUYER

The obligation of Buyer to consummate the transactions contemplated hereby shall be subject to the satisfaction (or waiver in writing by Buyer) on or prior to the Closing of the conditions set forth below.

6.1     Sale Order.  Seller shall have delivered to Buyer (a) a copy of the Sale Order (which shall contain the terms described in Section 9.1 and otherwise be in form and substance satisfactory to Buyer and must be a Final Order) and (b) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Seller.

6.2     Bankruptcy Court Orders.  The Bankruptcy Court shall have entered the Sale Order (as provided in Article IX) in form and substance satisfactory to Buyer.

**Exhibit B**

6.3     Representations and Warranties.    Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date (other than such representations and warranties as are made as of another date, which shall be true and correct as of such date) (without giving effect to any limitations or qualifications as to "materiality" (including the word "material") or "Material Adverse Effect" set forth therein).

6.4     Covenants.    Seller shall have complied in all material respects with the agreements, covenants, undertakings and obligations set forth herein to be complied with by Seller prior to the Closing Date.

6.5     Certificate.    Seller shall have delivered to Buyer a certificate, dated as of the Closing Date, and signed by an executive officer of Seller, stating that the conditions set forth in Sections 6.3 and 6.4 have been satisfied.

6.6     No Order; No Litigation.    No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins or otherwise prohibits consummation of purchase and sale of the Purchased Assets or the other transactions contemplated hereby (a "*Prohibition*"), and no Governmental Entity shall have instituted any proceeding seeking any such Prohibition.

6.7     Assumption and Assignment of Contracts.    The court shall have approved the assumption by Seller and assignment to Buyer of the Assumed Contracts or the Buyer shall have entered into new contracts satisfactory to Buyer with the counterparties thereto.

6.8     Ancillary Agreements.    Seller shall have duly executed and delivered to Buyer, as applicable, each of the Ancillary Agreements, each in form and substance satisfactory to Buyer, as applicable, to which it is a party.

ARTICLE VII

CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to consummate the transactions contemplated hereby shall be subject to the satisfaction (or waiver in writing by Seller) on or prior to the Closing Date of the conditions set forth below.

7.1     Bankruptcy Court Orders.    The Bankruptcy Court shall have entered Sale Order (as provided in Article IX) in form and substance reasonably satisfactory to Seller.

7.2     Representations and Warranties.    Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct on and as of the Closing Date, with the same force and effect as if made on and as of the Closing Date (other than such representations and warranties as are made as of another date, which shall be true and correct as of such date), except where the failure to be so true and correct (without giving effect to any limitations or qualifications as to "materiality" (including the word "material") set forth therein) does not, and would not be reasonably likely to, individually or in the aggregate, impair,

**Exhibit B**

restrict or delay the ability of Buyer to consummate the transactions contemplated by this Agreement.

7.3    <u>Covenants</u>.  Buyer shall have complied in all material respects with the agreements, covenants, undertakings and obligations set forth herein to be complied with by Buyer prior to the Closing Date.

7.4    <u>Certificate</u>.  Buyer shall have delivered to Seller a certificate, dated as of the Closing Date, and signed by an executive officer of Buyer, stating that the conditions set forth in Sections 7.2 and 7.3 have been satisfied.

7.5    <u>No Order; No Litigation</u>.    No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Prohibition, and no Governmental Entity shall have instituted any proceeding seeking any Prohibition.

7.6    <u>Ancillary Agreements</u>.  Buyer shall have duly executed and delivered to Seller each of the Ancillary Agreements to which it is a party.

7.7    <u>DIP Loan</u>.  The Bankruptcy Court shall have entered the DIP Order on terms and conditions materially consistent with the DIP Motion.

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

8.1    <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)    by mutual written consent of Buyer and Seller;

(b)    by either Buyer or Seller, if any Governmental Entity shall have issued, enacted, entered, promulgated or enforced any Prohibition and such Prohibition shall have become final and non-appealable; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this Section 8.1(b) shall not be available to any party that has failed to comply with its obligations hereunder in any manner that shall have proximately contributed to the occurrence of such Prohibition;

(c)    by either Buyer or Seller prior to the Closing, if, following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any material respect without the prior written consent of Buyer and Seller; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 8.1(c) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Sale Order to be in full force or effect;

(d)    by Buyer, if Seller enters into definitive documentation regarding an Acquisition Proposal with any Person other than Buyer;

111072717.7

**Exhibit B**

(e)     by Buyer, if there has been a breach of any representation, warranty, covenant or agreement made by Seller in this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach has not been cured by Seller within twenty (20) Business Days of Seller's receipt of written notice of such breach from Buyer which notice shall specify in reasonable detail the nature of such breach; provided, however, that there is not then a breach of, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII;

(f)     by Seller, if there has been a breach of any representation, warranty, covenant or agreement made by Buyer in this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach has not been cured by Buyer within twenty (20) Business Days of Buyer's receipt of written notice of such breach from Seller which notice shall specify in reasonable detail the nature of such breach; provided, however, that there is not then a breach of, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI;

(g)     by Buyer, at any time after Seller files any standalone chapter 11 plan of reorganization with the Bankruptcy Court or at any time after Seller files any chapter 11 plan that involves approval of a sale of any Purchased Assets to a party other than Buyer;

(h)     by Buyer, if the Sale Order shall not have been entered by the Bankruptcy Court by June 1, 2017;

(i)     by Buyer, if the Sale Order is modified in any material respect, as determined in the sole discretion of Buyer, in each case without the prior written consent of Buyer; or

(j)     by either Buyer or Seller, if the Closing shall have not been consummated on or before June 15, 2017 (the "*Outside Date*"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Seller, then Buyer (if it is so in breach) or Seller (if it is so in breach) may not terminate this Agreement pursuant to this Section 8.1(j).

8.2     Procedure Upon Termination.   In the event of a termination of this Agreement by Buyer or Seller, or both, pursuant to Section 8.1:  (a) written notice thereof shall be given promptly by the terminating party to the other party, specifying the provision hereof pursuant to which such termination is made, (b) except as contemplated by Section 8.3, this Agreement shall thereupon terminate and become void and of no further force and effect, and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties.

8.3     Effect of Termination.   In the event that this Agreement is validly terminated as provided in Section 8.1 and Section 8.2, this Agreement will be of no further force or effect and there will be no Liability on the part of any party with respect thereto; provided,

{41465722;1}19

**Exhibit B**

however, that Section 5.2, this Section 8.3, Article I, Article XI shall survive any such termination and shall be enforceable hereunder.

## ARTICLE IX

## BANKRUPTCY COURT MATTERS

9.1     Sale Order.  The Sale Order shall be entered by the Bankruptcy Court on or before June 1, 2017 in the form attached hereto as Exhibit E and otherwise in form and substance acceptable to Seller and Buyer.  The Sale Order shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale by Seller of the Purchased Assets to Buyer on the terms and subject to the conditions herein and free and clear of all Liens, Claims and Encumbrances, and (iii) the performance by Seller of its obligations under this Agreement; (b) authorize and empower Seller to assign to Buyer the Contracts; (c) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code; (d) find that the Agreement was negotiated at arms' length and was not the product of collusion, and is not avoidable pursuant to Section 363(n) of the Bankruptcy Code; and (e) find that Buyer is not a successor to the Seller or the bankruptcy estate by reason of any theory of law or equity, and that the Buyer shall not assume or in any way be responsible for any liability of Seller or its bankruptcy estate except as otherwise expressly provided in the Agreement.  Buyer agrees that it will timely take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Buyer is a "good faith" buyer under Section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.  In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, Seller shall use best efforts to defend such appeal.

## ARTICLE X

## TAX MATTERS

10.1     Transfer Taxes.  Notwithstanding anything herein to the contrary, Seller shall be liable for and shall pay all transfer, gains, sales, use, stock transfer and stamp taxes, recording, registration and other fees, and any similar Taxes which become payable in connection with the transactions contemplated by the Agreement (collectively, "***Transfer Taxes***").

10.2     Bulk Sales Laws.   The parties hereby waive compliance with the provisions of any tax clearance procedures, bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**Exhibit B**

ARTICLE XI

MISCELLANEOUS

11.1    <u>Specific Enforcement</u>.  The parties agree that irreparable damage would occur and that the parties would not have an adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions in this Agreement in any state court in the State of Florida (and any appellate court of the State of Florida) and the federal courts of the United States located in the Southern District of the State of Florida, this being in addition to any other remedy to which the parties are entitled at law or in equity.

11.2    <u>Survival</u>.  The parties hereto agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date, except for the representations and warranties set forth in Section 3.4 (Intellectual Property), which shall survive the Closing.  Notwithstanding the foregoing, to the extent that any specific claims for indemnification in respect of a breach of any such representation or warranty is made in writing on or before such date of termination of such representation or warranty, such representation or warranty shall survive until the resolution of such claim.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

11.3    <u>Indemnification</u>.  Subject to the limitations set forth in Section 11.2, after the Closing, Seller shall indemnify Buyer and/or its officers, directors, employees, Affiliates and/or agents (each a "***Buyer Indemnitee***" and, collectively, the "***Buyer Indemnitees***"), and hold each Buyer Indemnitee harmless from and against any loss, Liability, deficiency, damage, fine, penalty, Tax or expense (including reasonable legal expenses and costs and any cost or expense arising from or incurred in connection with any action, suit, proceeding, claim or judgment relating to any matter described in this clause, or in enforcing the indemnity provided by this Section 11.3 (any such amount, a "***Loss***")), which such Buyer Indemnitee may suffer, sustain or become subject to, as a result of any breach by Seller of the representations and warranties set forth in Section 3.4 (Intellectual Property).

11.4    <u>Notices</u>.    All notices, requests, demands and other communications pursuant to this Agreement shall be in writing, addressed to the address of the parties stated below or to such changed address as such party may have fixed by notice, and shall be deemed to have been given and received:  (a) the same day, if by hand delivery, (b) the next Business Day, if by a nationally-recognized overnight courier, (c) five (5) days after mailed, in any general or branch United States Post Office, enclosed in a registered or certified post-paid envelope, return receipt requested or (d) upon confirmation of receipt during normal business hours, if by fax, e-mail or other form of electronic transmission:

**Exhibit B**

If to Buyer to:

        VB Funding, LLC
        190 Farmington Avenue
        Farmington, CT 06032
        Attention:  VJ Dowling
        Fax No.:  (860) 676-8617

and

        Carlton Fields
        One State Street, Suite 1800
        Hartford, CT 06103
        Attention:  H. Scott Miller
        Fax No.:  (860) 392-5058

If to Seller, to:

        Grandparents.com, Inc.
        589 Eighth Avenue, 6th Floor
        New York, NY 10018
        Attention:  Joshua Rizack
        Fax No.:  (646) 654-6106

and

        Akerman LLP
        401 East Jackson Street, Suite 1700
        Tampa, FL 33602
        Attention:  Steven R. Wirth
        Fax No.:  (813) 209-5093

Any notice of change of address shall be effective only upon receipt.

       11.5   <u>Governing Law</u>.  This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Florida shall govern, without giving effect to the choice of law principles thereof, including all matters of construction, validity and performance.

       11.6   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**Exhibit B**

11.7    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed an original, but all of which together shall constitute one and the same instrument.  The exchange by facsimile or other means of electronic transmission of executed counterparts of this Agreement shall be deemed execution and delivery thereof.

11.8    <u>Public Announcement</u>.  Neither Buyer nor Seller will issue or permit any of its respective Affiliates, agents, stockholders, directors, officers or employees to issue, any press release or public filing or other public announcement concerning the transactions contemplated hereby without the prior written consent of the other; <u>provided</u>, <u>however</u>, that nothing contained herein shall prevent Buyer or Seller or their respective Affiliates from furnishing, before or after the Closing, any required information to, or filing any required information with, the Bankruptcy Court or any other Governmental Entity or national securities exchange in order to comply with its legal obligations or from disclosing any information deemed necessary by Seller in its financial statements.

11.9    <u>Expenses</u>.    Whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby (including the fees and disbursements of the counsel, accountants or auditors retained by each party in connection with the negotiation, preparation, execution and performance of this Agreement, or any other document, agreement or requirement contemplated by or resulting from the transactions described in this Agreement) shall be paid by the party incurring such costs and expenses.

11.10    <u>Binding Effect; Assignment</u>.    This Agreement shall be binding upon Buyer and, subject to entry of the Sale Order, Seller, and inure to the benefit of the parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 case.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement.  Neither this Agreement, nor any of the rights or obligations hereunder, may be assigned by any party hereto without the prior written consent of the other parties hereto, <u>provided</u>, <u>however</u>, that Buyer may assign this Agreement to any of its Affiliates.

11.11    <u>Consent to Jurisdiction; Waiver of Jury Trial</u>.

**(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF FLORIDA AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE MIDDLE DISTRICT OF THE STATE OF FLORIDA WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.**

**Exhibit B**

**(b)      EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR ANY ANCILLARY AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN.**

11.12   <u>Amendment; Waiver</u>.  No provision of this Agreement may be amended, supplemented or modified except by a written instrument signed by all of the parties hereto. Either Buyer or Seller may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto or (c) waive compliance with any of the agreements or conditions of the other party contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party or parties to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition, of this Agreement.  The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

11.13   <u>Entire Agreement</u>.  This Agreement, including the Annexes and Exhibits hereto, and the Ancillary Agreements set forth the entire agreement and understanding among the parties as to the subject matter hereof and merge and supersede all prior discussions, agreements and understandings of every kind and nature among them with respect to the subject matter hereof, and no party hereto shall be bound by any representation, warranty, covenant, term or condition, whether written or oral, other than as expressly provided for in this Agreement or any Ancillary Agreement as to the subject matter hereof or thereof..

11.14   <u>Entire Agreement</u>.   Seller shall allow Buyer and its Representatives, during regular business hours upon reasonable notice, to make such inspection of the Books and Records and all other documents and information reasonably requested by Buyer and related to the Purchased Assets, and to meet with Seller's designated personnel and/or their representatives. Seller shall make available to Buyer promptly upon reasonably requested by Buyer and its Representatives (i) all additional documents and information with respect to the Purchased Assets, and (ii) access to Seller's personnel or Representatives as Buyer, or its Representatives, may from time to time reasonably request and shall instruct such personnel and Representatives to cooperate with Buyer and its Representatives, and to make available such documents and information (subject to any attorney-client or other privileges or immunities) as Buyer and its Representatives may request.

*[Remainder of page intentionally left blank, Signature page follows.]*

**Exhibit B**

IN WITNESS WHEREOF, Buyer and Seller have duly executed and delivered this Agreement as of the day and year first above written.

**SELLER:**

GRANPARENTS.COM, INC.,
a Delaware limited liability company

By: _____
Name: Joshua Rizuch
Title: Chief Restructuring Advisor

GRAND CARD, LLC,
a Florida limited liability company

By: _____
Name: Joshua Rizuch
Title: Chief Restructuring Advisor

**BUYER:**

VB FUNDING, LLC,
a Delaware limited liability company

By: _____
Name: Vincent J. Doulby, Jr.
Title: Managing Member

Signature Page to Asset Purchase Agreement

**Exhibit B**

<u>EXHIBIT A</u>

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

<u>**ASSIGNMENT AND ASSUMPTION AGREEMENT**</u>

This **ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "**Agreement**") is made and entered into as of _____, 2017 by and between [_____], a [_____] ("**Assignor**"), and [_____], a [_____] ("**Assignee**").

This Agreement is executed pursuant to that certain Asset Purchase Agreement, dated as of April 14, 2017, by and between Assignor and Assignee (the "**Purchase Agreement**"). Capitalized terms used but not defined in this Agreement shall have the respective meanings ascribed to them in the Purchase Agreement.

The parties hereto agree as follows:

1.    <u>**Assignment and Assumption**</u>.  Subject to the terms of the Purchase Agreement, Assignor hereby assigns to Assignee, and Assignee hereby assumes the following:

(a)    all membership interests in American Grandparents Association LLC, a Florida limited liability company;

(b)    all membership interests in Grandparents Insurance Solutions LLC, a Florida limited liability company

(c)    all Assumed Contracts, and all rights and benefits thereunder; and

(d)    all other Purchased Assets to the extent to conveyed and assigned pursuant to the Bill of Sale, the Patent Assignment Agreement or the Trademark Assignment Agreement.

2.    <u>**General Provisions**</u>.  This Agreement shall be governed by the laws of the State of Florida without giving effect to the choice of law principles thereof that would result in the application of the laws of any other jurisdiction.  This Agreement, being further documentation of the conveyances, assignments and assumptions provided for, in and by the Purchase Agreement, neither expands nor limits the rights, obligations and warranties of the parties under the Purchase Agreement.  Thus, to the extent any provision of this Agreement conflicts with the Purchase Agreement, the Purchase Agreement shall control.  This Agreement (a) shall bind the parties hereto and their successors and assigns, (b) may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement, and (c) may be transmitted by facsimile or other electronic transmission and the signatures so transmitted shall be treated as originals for all purposes.

**[*Signature Page Follows*]**

**Exhibit B**

**IN WITNESS WHEREOF**, the Parties have caused this Assignment and Assumption Agreement to be executed and delivered by their duly authorized representatives as of the date set forth above.

**Assignee: [_____]**          **Assignor:  [_____]**


By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____
Date:_____          Date:_____

**Exhibit B**

## EXHIBIT B

**FORM OF BILL OF SALE**

## BILL OF SALE

This **BILL OF SALE** (this "**Bill of Sale**") is made effective as of [_____] by [_____], a [_____] ("**Seller**"), in favor of [_____], a [_____] ("**Buyer**").

This Bill of Sale is executed pursuant to that certain Asset Purchase Agreement, dated as of September 1, 2016, by and between Buyer and Seller (the "**Purchase Agreement**"). Terms not defined in this Bill of Sale shall be as defined in the Purchase Agreement.

Seller hereby sells, assigns, transfers, and delivers to Buyer, and Buyer accepts, all of Seller's right, title and interest to and in all of the Purchased Assets.

This Bill of Sale shall be governed by the laws of the State of Florida without giving effect to the choice of law principles thereof that would result in the application of the laws of any other jurisdiction.

This Bill of Sale, being further documentation of the conveyances, assignments and transfers provided for, in and by the Purchase Agreement, neither expands nor limits the rights, obligations and warranties of the parties under the Purchase Agreement. Thus, to the extent any provision of this Bill of Sale conflicts with the Purchase Agreement, the Purchase Agreement shall control. This Bill of Sale (a) shall bind the Seller and its successors and assigns, (b) may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Bill of Sale and all of which, when taken together, will be deemed to constitute one and the same agreement, and (c) may be transmitted by facsimile or other electronic transmission and the signatures so transmitted shall be treated as originals for all purposes.

111072717.7

**Exhibit B**

**IN WITNESS WHEREOF**, the parties have caused this Bill of Sale to be executed and delivered by their duly authorized representatives as of the date set forth above.

**Seller: [_____]**               **Buyer:  [_____]**

By:_____               By:_____

Name:_____               Name:_____

Title:_____               Title:_____

Date:_____               Date:_____

111072717.7

**Exhibit B**

EXHIBIT C

**FORM OF PATENT ASSIGNMENT AGREEMENT**

This **PATENT ASSIGNMENT AGREEMENT** ("**Assignment**") is by and between [_____], a [_____] having offices at [_____] ("**Assignor**"), and [_____], a [_____] having offices at [_____] ("**Assignee**") and shall be effective as of _____, 2017 (the "**Effective Date**"). Assignor and Assignee may each be referred to herein as a "**Party**" and may be referred to jointly herein as the "**Parties**."

**WITNESSETH:**

**WHEREAS**, Assignor has or may have certain rights in the patents identified on Schedule A attached hereto (the "**Patents**"), and their associated federal registrations (the "**Registrations**");

**WHEREAS**, Assignee and Assignor (among others) are parties to that certain Asset Purchase Agreement dated _____, 2017, as amended (the "**Purchase Agreement**"), pursuant to which Assignor has sold and Assignee has purchased assets of Assignor, including but not limited to the Patents and the Registrations;

**WHEREAS**, the Parties desire to record, memorialize, codify, and affirm that all right, title and interest in and to the Patents, goodwill, and the Registrations, and associated rights are transferred from Assignor to Assignee.

**NOW, THEREFORE**, in consideration of the mutual covenants herein, and other good and valuable consideration, receipt, adequacy, and legal sufficiency of which are hereby acknowledged by Assignor, and all Parties intending to be legally bound hereby, Assignor and Assignee agree as follows:

1.      Assignment.

(a)      Assignor herby contributes grants, sells, conveys, transfers, assigns, releases, and delivers to Assignee, its successors, assigns, and legal representatives, any and all right, title, and interest Assignor has or may have in or to the Patents and the Registrations, including without limitation all common law rights, rights acquired through use, license or assignment, state law rights, rights in foreign nations, all registrations and applications for registration thereof, in all states, nations, communities, and regions worldwide, and all goodwill associated therewith, together with all liabilities, duties and obligations relating to the Patents and the Registrations, all rights to file applications directed to the Patents and all rights to obtain and maintain registrations for the Patents worldwide, and all rights to bring actions and recover damages for any and all past, present and future infringements of the Patents in any and all jurisdictions throughout the world, including all rights as opponents in any opposition.

111072717.7

**Exhibit B**

(b)     Assignor agrees to cooperate with Assignee upon Assignee's request, and for no additional consideration, to perfect, record, and otherwise document Assignee's rights to the Patents and associated rights and goodwill, and all registrations and applications for registrations thereof throughout the world including, without limitation, executing such separate assignments, certifications, and other documents as Assignee may reasonably deem necessary or desirable in maintaining such rights, filing, prosecuting or maintaining any registrations or applications, and recording and otherwise perfecting and enforcing Assignee's rights and title hereunder.  To the extent any separate assignments are executed and/or recorded in connection with any registration or application, such separate assignment shall be deemed to be a memorialization of the transfer of rights, title, and interests described herein and, to the extent any such separate assignment or other document is inconsistent with this Assignment, the separate assignment or other document and this Assignment shall be interpreted together such that the maximum possible rights, title and interest are assigned and transferred to Assignee.

(c)     Assignor hereby authorizes Assignee, its successors and assigns, to take any appropriate action in connection with the Patents and the Registrations, and all other applications, registrations, goodwill, and rights assigned hereunder, in the name of the Assignor, but at Assignee's own expense.

(d)     Any nation or state, or agency or representative thereof, or individual, partnership, corporation, or other entity, may rely without further inquiry upon the powers and rights granted to Assignee herein and upon any notarization, certification, verification, affidavit or jurat by any notary public of any state relating to the authorization, execution, and delivery of this Assignment of the authenticity of any copy, conformed or otherwise, hereof.

2.     <u>Miscellaneous</u>.

(a)     The terms and provisions of this Assignment will be binding upon and shall extend to, and inure to the benefit of the Parties and their successors and assigns.

(b)     In the event that any term or provision of this Assignment is held to be invalid, illegal or unenforceable in any respect, such term or provision shall be deemed amended to the extent necessary to render it valid, legal and enforceable, and the Parties agree to be bound by the same as thus amended, and the remaining terms and provisions of this Assignment shall not be affected or impaired thereby.

(c)     This Assignment shall be construed under the laws of the State of Florida, without reference to principles of conflicts of laws.

(d)     This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute but one and the same instrument.  The facsimile signature of any Party to this Assignment or a PDF or other copy of the signature of a Party to this Assignment delivered by other electronic means shall be considered to have the same binding effect as the delivery of an original signature on an original contract.

***[Remainder of page intentionally left blank.  Signature page follows.]***

**Exhibit B**

**IN WITNESS WHEREOF**, the Parties have caused this Patent Assignment Agreement to be executed and delivered by their duly authorized representatives as of the date set forth above.


**Assignee: [_____]**          **Assignor:  [_____]**


By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____
Date:_____          Date:_____

## EXHIBIT D

## FORM OF TRADEMARK ASSIGNMENT AGREEMENT

This **TRADEMARK ASSIGNMENT AGREEMENT** ("**Assignment**") is by and between [_____], a [_____] having offices at [_____] ("**Assignor**"), and [_____], a [_____] having offices at [_____] ("**Assignee**") and shall be effective as of _____, 2017 (the "**Effective Date**"). Assignor and Assignee may each be referred to herein as a "**Party**" and may be referred to jointly herein as the "**Parties**."

### WITNESSETH:

**WHEREAS**, Assignor has or may have certain rights in the trademarks, trade names, and service marks identified on Schedule A attached hereto (the "**Marks**"), and their associated federal registrations (the "**Registrations**");

**WHEREAS**, Assignee and Assignor (among others) are parties to that certain Asset Purchase Agreement dated _____, 2017, as amended (the "**Purchase Agreement**"), pursuant to which Assignor has sold and Assignee has purchased assets of Assignor, including but not limited to the Marks and the Registrations;

**WHEREAS**, the Parties desire to record, memorialize, codify, and affirm that all right, title and interest in and to the Marks, goodwill, and the Registrations, and associated rights are transferred from Assignor to Assignee.

**NOW, THEREFORE**, in consideration of the mutual covenants herein, and other good and valuable consideration, receipt, adequacy, and legal sufficiency of which are hereby acknowledged by Assignor, and all Parties intending to be legally bound hereby, Assignor and Assignee agree as follows:

3. Assignment.

(e) Assignor herby contributes grants, sells, conveys, transfers, assigns, releases, and delivers to Assignee, its successors, assigns, and legal representatives, any and all right, title, and interest Assignor has or may have in or to the Marks and the Registrations, including without limitation all common law rights, rights acquired through use, license or assignment, state law rights, rights in foreign nations, all registrations and applications for registration thereof, in all states, nations, communities, and regions worldwide, and all goodwill associated therewith, together with all liabilities, duties and obligations relating to the Marks and the Registrations, all rights to file applications directed to the Marks and all rights to obtain and maintain registrations for the Marks worldwide, and all rights to bring actions and recover damages for any and all past, present and future infringements of the Marks in any and all jurisdictions throughout the world, including all rights as opponents in any opposition.

(f)      Assignor agrees to cooperate with Assignee upon Assignee's request, and for no additional consideration, to perfect, record, and otherwise document Assignee's rights to the Marks and associated rights and goodwill, and all registrations and applications for registrations thereof throughout the world including, without limitation, executing such separate assignments, certifications, and other documents as Assignee may reasonably deem necessary or desirable in maintaining such rights, filing, prosecuting or maintaining any registrations or applications, and recording and otherwise perfecting and enforcing Assignee's rights and title hereunder.  To the extent any separate assignments are executed and/or recorded in connection with any registration or application, such separate assignment shall be deemed to be a memorialization of the transfer of rights, title, and interests described herein and, to the extent any such separate assignment or other document is inconsistent with this Assignment, the separate assignment or other document and this Assignment shall be interpreted together such that the maximum possible rights, title and interest are assigned and transferred to Assignee.

(g)      Assignor hereby authorizes Assignee, its successors and assigns, to take any appropriate action in connection with the Marks and the Registrations, and all other applications, registrations, goodwill, and rights assigned hereunder, in the name of the Assignor, but at Assignee's own expense.

(h)      Any nation or state, or agency or representative thereof, or individual, partnership, corporation, or other entity, may rely without further inquiry upon the powers and rights granted to Assignee herein and upon any notarization, certification, verification, affidavit or jurat by any notary public of any state relating to the authorization, execution, and delivery of this Assignment of the authenticity of any copy, conformed or otherwise, hereof.

4.      <u>Miscellaneous</u>.

(e)      The terms and provisions of this Assignment will be binding upon and shall extend to, and inure to the benefit of the Parties and their successors and assigns.

(f)      In the event that any term or provision of this Assignment is held to be invalid, illegal or unenforceable in any respect, such term or provision shall be deemed amended to the extent necessary to render it valid, legal and enforceable, and the Parties agree to be bound by the same as thus amended, and the remaining terms and provisions of this Assignment shall not be affected or impaired thereby.

(g)      This Assignment shall be construed under the laws of the State of Florida, without reference to principles of conflicts of laws.

(h)      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute but one and the same instrument.  The facsimile signature of any Party to this Assignment or a PDF or other copy of the signature of a Party to this Assignment delivered by other electronic means shall be considered to have the same binding effect as the delivery of an original signature on an original contract.

*[Remainder of page intentionally left blank.  Signature page follows.]*

**Exhibit B**

**IN WITNESS WHEREOF**, the Parties have caused this Trademark Assignment Agreement to be executed and delivered by their duly authorized representatives as of the date set forth above.


**Assignee: [_____]**                    **Assignor:  [_____]**


By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____
Date:_____          Date:_____

**Exhibit B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:                                                          Chapter 11 Cases

GRANDPARENTS.COM, INC.,                                         Case No. 17-14711-LMI
GRAND CARD LLC,                                                 Case No. 17-14704-LMI

　　　　Debtors.[1]                                             (Joint Administration Pending)

_____/

**ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR
ORDERS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 APPROVING SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, RIGHTS, AND INTERESTS, APPROVING
THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED CONTRACTS
AND GRANTING RELATED RELIEF  (ECF No.　  )**

This matter came on to be heard on _____, 2017 at ____ a.m./p.m.. (the "Sale

Hearing"), upon the emergency motion of the debtors, Grandparents.com, Inc. ("GP") and Grand

Card, LLC ("Grand Card" and where collectively with GP, the "Debtors"), seeking entry of an

---

[1] The address and the last four digits of the taxpayer identification of each of the debtors: (i) Grandparents.com, Inc., 589 8th Avenue, 6th Floor, New York, NY 10018 (1114) and (ii) Grand Card LLC, 10800 Biscayne Boulevard, Suite 750, Miami, FL 33161 (3030).

**Exhibit B**

order approving and authorizing the sale of substantially all of the Debtors' assets to VB Funding, LLC (the "Stalking Horse") subject to higher and better offers and for related relief (the "Motion") (ECF No. __) and the Bid Procedures Order (defined below), and the Court having reviewed all of the evidence proffered or adduced at the Sale Hearing and previous evidentiary hearings in these cases, any objections to the Motion and taken judicial notice of the record, heard argument of counsel, due and sufficient notice of the Motion having been provided, good and sufficient cause appearing and the Court being duly advised in the premises and for the reasons stated on the record at the Sale Hearing the Court makes the following

### FINDINGS OF FACT AND CONCLUSIONS OF LAW:

1.      Unless otherwise indicated herein, all capitalized terms used but not defined herein shall have the meanings given in the Motion.

2.      On April 14, 2017, the Debtors filed voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

3.      This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue of these cases and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code, and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006 and 9014.

4.      On April 14, 2017, the Debtors and the Stalking Horse entered into that certain Asset Purchase Agreement (the "APA") attached as Exhibit "B" to the Motion.

**Exhibit B**

5.      Pursuant to the Order approving bid procedures and scheduling, *inter alia,* form and manner of sale notice and scheduling final hearings (the "Bid Procedures Order") (ECF No. ___), the Court scheduled the:  i) Sale Hearing to approve the sale of the Debtors' assets designated for purchase by the Stalking Horse or a Potential Bidder (the "Assets") as set forth on **Exhibit "A"** to the Bid Procedures Order (ECF No. ___) to the Stalking Horse pursuant to the terms of the APA, subject to higher and better offers; and ii) the Auction of the Assets if one is held for _____, 2017.

6.      The Assets being sold excludes the following:

> Chapter 5 causes of action; other causes of action of the Debtors, including, but not limited to, any rights of setoff arising from or related to rejected executory contracts and unexpired leases or executory contracts or unexpired leases not specifically assumed by the Stalking Horse or Potential Bidder; the Debtors' Directors' and Officers' Liability Policies; the Debtors' Errors and Omissions Liability Policies; any other Assets not specifically designated as a Purchased Asset under the APA.

7.      Proper, timely, adequate and sufficient notice of the Sale Motion, the Bid Procedures Order, the Sale, the Sale Hearing, the Auction, and the transactions contemplated thereby have been provided in accordance with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004 and the Bid Procedures Order, and no other or further notice of the Sale Motion, the hearing held on _____, 2017 resulting in the Bid Procedures Order, the Sale or the transactions contemplated thereby, the Sale Hearing or the entry of this Order is required.

8.      A reasonable and proper opportunity to object or to be heard regarding the Bid Procedures, the Auction, the Sale and the Sale Hearing as set forth in the Bid Procedures Order has been afforded to all creditors and interested persons, including: (a) the Office of the United States Trustee; (b) counsel to the pre-Petition and post-Petition Lenders; (c) those creditors

holding the 20 largest unsecured claims against the Debtors' estate; (d) all parties known to be asserting a lien in the Debtors' assets; (e) all counterparties to executory contracts and unexpired leases potentially to be assumed and assigned; (f) all state attorney generals in states where the Debtors conduct business; and (g) various federal and state tax authorities, including the Internal Revenue Service; (h) the Securities and Exchange Commission, and (i) counsel to any Committee which may be formed.

9. The solicitations by the Debtors and their professionals in connection with the Sale of the Assets and the assumption and assignment of executory contracts and unexpired leases were adequate and reasonable under the circumstances of these cases to obtain the highest and best price for the Assets.

10. The Debtors have adequately marketed the Assets and conducted the sale process in compliance with the Bid Procedures Order and in a manner that was non-collusive, substantively and procedurally fair to all interested parties and commercially reasonable.

11. Throughout the sale process the Debtors acted in good faith and afforded all interested potential purchasers information in its possession, including the information set forth in the Bid Procedures Order, to enable them to make an informed judgment as to the acquisition of the Assets, making all information available to all potential purchasers without any discrimination or preference.

12. The APA is the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse and is on commercially reasonable terms. The Debtors and the Stalking Horse, and their respective professionals, negotiated the terms of the Agreement over the course of several weeks. Further, while the Stalking Horse is a significant shareholder of the GP (holding approximately 44.5% of GP's common stock), it does not hold any seats on GP's

**Exhibit B**

board of directors, nor does it have any control over the Debtors' management, and therefore, all negotiations were undertaken in good faith and in compliance with the Bankruptcy Code.

13.     The transaction contemplated by the APA is (a) subject to the protections afforded to "good faith" purchasers under section 363(m) of the Bankruptcy Code, and (b) not subject to avoidance under section 363(n) of the Bankruptcy Code.

14.     The Stalking Horse has a valid, unavoidable first position security interest ($9,827,621.96), in all of the Debtors' assets and has the absolute right to Credit Bid.

15.     The Debtors have taken all action necessary to authorize and approve the Sale and the consummation by the Debtors of the transactions contemplated thereby. Other than such approvals or consents as set forth herein or in the APA, no further or other consents or approvals are required to consummate the Sale and all transactions contemplated thereby.

16.     The bid procedures, the Sale Motion, the potential Auction, the Sale, the Debtors' determination that the APA constitutes the highest and best offer for the Assets and the Debtors' determination that the APA constitutes the highest and best offer for the Assets reflect the Debtors' valid and sound exercise of its business judgment and constitute a proper exercise of the Debtors' fiduciary duties.

17.     The Debtors have demonstrated compelling circumstances for the Sale to the Stalking Horse, subject to higher and better offers, pursuant to 11 U.S.C. § 363(b) based upon, among other things:

(a)     The Debtors' need for additional liquidity will preclude them from operating in the ordinary course of business for a sufficient period of time to reorganize their business other than through an immediate sale of the Assets.

(b)     Even with the continued use of cash collateral and the interim post-petition financing obtained by the Debtors, the Debtors cannot operate their businesses and preserve the value of the Assets without consummating the Sale with the Stalking Horse, subject to higher and better offers at the Auction if the Auction is held. If the Sale and related transactions under the APA are not approved and consummated promptly, the Debtors will exhaust the financing and cash collateral available to them and the Debtors' businesses will deteriorate to the point whereby the Stalking Horse would not consummate the transactions contemplated by this Order and the APA thereby forcing the Debtors to a liquidation that would achieve far less value for creditors than the transactions contemplated by the Sale and the APA.

(c)     A sale pursuant to section 363(b) of the Bankruptcy Code is the only current viable alternative for preserving and capturing the value of the Assets and ensuring the continuation of the Debtors' businesses. Without the Sale, the Debtors cannot continue to operate their businesses for the time required to confirm and consummate a plan of reorganization without risking an immediate and material decline in the value of their business and the Assets. Thus, the only way to preserve and maximize value is to consummate the Sale and sell the Assets in the manner proposed and approved at the Sale Hearing, thereby ensuring an orderly and equitable sales process and distribution of proceeds.

(d)     A sale of the Assets as a "going-concern" at this time to the Stalking Horse, subject to higher and better offers at Auction if the Auction is held, will result in the highest possible purchase price therefor.

18.     The Debtors, the Stalking Horse, and their respective professionals have complied, in good faith, in all respects with the Bid Procedures Order.

19.     Through marketing efforts and a competitive auction process conducted in accordance with the Bid Procedures Order, the Debtors and their professionals, (a) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase substantially all of the Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Assets, and (c) considered any bids submitted in accordance with the Bid Procedures Order.

20.     As part of the Sale, as hereinafter further provided and on the terms contained in this Order, the Stalking Horse has agreed to the assumption and assignment to it by the Debtors of the following unexpired leases and executory contracts (the "Designated Contracts"):

(a)     Letter Agreement by and between HSNi, LLC and Grandparents.com, Inc., dated as of February 18, 2015;

(b)     Program Agreement by and between Aetna Life Insurance Company and Grandparents.com, Inc., dated as of October 9, 2013, as amended by that certain Amendment No. 1 to Program Agreement, dated as of June 4, 2015, and as further amended by that certain Amendment No. 2 to Program Agreement, dated as of June 4, 2015;

(c)     Upline Marketing Agreement by and between Aetna Life Insurance Company and Grandparents Insurance Solutions LLC, dated as of 2015;

(d)     Marketing General Agent Contract, by and among Aetna Health and Life Insurance Company, Aetna Life Insurance Company, and Grandparents Insurance Solutions LLC, dated as of October 31, 2014; and

(e)     Marketing General Agent Contract (Addendum), by and among Aetna Health and Life Insurance Company, Aetna Life Insurance Company, and Grandparents Insurance Solutions LLC, dated as of October 31, 2014.

21.     The offer of the Stalking Horse, upon the terms and conditions set forth in the APA, including the form and total consideration to be realized by the Debtors' estates pursuant to the APA, subject to higher and better offers at Auction if an Auction is held, is fair and reasonable; is in the best interests of the Debtors' creditors and estates; constitutes full and

adequate consideration and reasonably equivalent value for the Assets; and will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by liquidation of the Assets or any other practical and available alternative dispositions.

22.     The APA and the transactions thereunder or in connection therewith, including, without limitation, any assumption and assignment of executory contracts or unexpired leases, are not being entered into to escape liability for the estates' debts.

23.     The Debtors' estates are unable to satisfy all of the Debtors' debts.  The Sale and the transactions contemplated thereby were negotiated, proposed, and entered into by the Debtors and the Stalking Horse at arms' length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code and the sales process was conducted in accordance with the Bid Procedures Order. As a result of the foregoing, the Debtors and the Stalking Horse are entitled to the protections of section 363(m) of the Bankruptcy Code.

24.     None of the Debtors or the Stalking Horse or any other party has engaged in any conduct that would cause or permit the Sale or any transaction executed in connection therewith to be avoided under section 363(n) of the Bankruptcy Code. The Stalking Horse has not violated section 363(n) by any action or inaction, and neither the Sale nor the transactions contemplated thereby violate the provisions of section 363(n) of the Bankruptcy Code.

25.     The Stalking Horse would not have entered into the Sale and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale of the Assets to the Stalking Horse were not entirely free and clear of all interests of any kind or nature whatsoever, or if the Stalking Horse would, or in the future could, be liable for any of such interests (except for interests expressly assumed by Stalking Horse under APA).

26.     The Debtors may sell the Assets entirely free and clear of all interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)- (5) of the Bankruptcy Code has been satisfied. Specifically, each entity with a security interest in any of the Assets has consented to their sale, is deemed to have consented to their sale, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest, holds liens subject to a bona fide dispute, or the Sale of the Assets otherwise satisfies the requirements of section 363(f) of the Bankruptcy Code.  To that end, those nondebtor parties with interests in the Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to such Sale pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code.

27.     The relief requested in the Sale Motion, including the approval of the Sale, is in the best interests of the Debtors, their estates and their creditors. The Debtors and the Stalking Horse may make conforming or non-substantive amendments to the APA and any related agreements prior to Closing.

28.     To the greatest extent available under applicable law and except as may otherwise be provided herein, the Stalking Horse shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Stalking Horse as of the Closing Date.

29.     Except as otherwise provided herein, all of the Debtors' interests in the Assets to be acquired by the Stalking Horse under the APA shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Stalking Horse. Upon the occurrence

of the Closing and except as otherwise provided herein, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets acquired by the Stalking Horse under the APA and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Assets to the Stalking Horse.

30.    Based upon the foregoing findings and conclusions, and upon the record made before this Court at the hearing, good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED DETERMINED AND DECREED that:**

31.    The Motion is GRANTED.

32.    The Sale of the Assets to the Stalking Horse, VB Funding, LLC, subject to higher and better offers at the _____, 2017 Auction if an Auction is held, is authorized and approved.

33.    The provisions of this Order shall be binding upon and inure to the benefit of the Stalking Horse and the Debtors and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtors' estates or of any estate in any successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Order.

34.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d) and 7062, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

35.    If (a) no Auction is held or (b) an Auction is held and the Stalking Horse is deemed to be the successful bidder at the Auction, then the Sale to the Stalking Horse shall be closed (the "Closing") *upon the earlier* of *i)* fifteen (15) days after the docketing of this Order, *and ii)* June 16, 2017 (the "Closing Deadline"), *provided, however*, that the Debtors and Stalking

Horse may extend the Closing Deadline for thirty (30) days by written agreement without the need or requirement to obtain any further order of the Court.

36.    The Debtors have full power and authority and are instructed to execute the documents contemplated by the APA including without limitation the bills of sale, together with any other documents as may be reasonably required to implement and consummate the Sale of the Assets by the Debtors to the Stalking Horse and the assumption and assignment of any Designated Contracts, which actions have been duly and validly authorized by the Debtors and the Debtors have all of the power and authority necessary to consummate the transactions contemplated under the Sale and this Order.

37.    Except as otherwise provided herein, upon entry of this Order and compliance with the requirements to close set forth herein and in the APA, the transfer of the Debtors' right, title, and interests in the Assets to the Stalking Horse is in all respects a valid, legal, and effective transfer of Assets to the Stalking Horse, under section 363(f) of the Bankruptcy Code, free and clear of all liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code), interests or encumbrances of any kind or nature whatsoever, including (but not limited to) (a) liens and claims that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or the interest in the Assets, or any similar rights, (b) liens and claims relating to taxes arising under, out of, in connection with, or in any way relating to the operation of the Assets prior to the closing, and (c) (i) all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal, or charges of any kind or nature, including, but not limited to, any restriction on the use, transfer, receipt of income or other exercise of any attributes of

**Exhibit B**

ownership, and (ii) all debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or any of the Debtors' predecessors or affiliates, claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests, and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise, including (but not limited to) claims otherwise arising under doctrines of successor liability (collectively, "Interests"). Except as otherwise provided herein, all Interests shall attach to the proceeds of the Sale, in their order of priority and with the same validity as if the Sale had not been consummated.

38.     The Stalking Horse shall not, as a result of any action taken in connection with the purchase of the Assets, be deemed to (a) be the successor of the Debtors or any one of them; (b) have, de facto or otherwise, merged with or into the Debtors or any one of them, or (c) be a mere continuation or a substantial continuation of the Debtors or any one of them or for payment of any benefit(s) accruing to the Debtors.

39.     The Stalking Horse shall not be liable as a successor in interest to the Debtors or under any theory of successor liability for any employee-related claims against the Debtors and/or their principal, including without limitation those claims filed and scheduled herein. Moreover, to the fullest extent authorized under applicable law, under no circumstances shall the Stalking Horse be deemed a successor of or to the Debtors for any other types of claims, Interests or causes of action against the Debtors or the Assets of any kind or nature whatsoever.

40.     The Purchase price shall be apportioned among the related Debtors as follows:

$1,500,000.00 – GP

11
**Exhibit B**

$500,000.00 – Grand Card

41.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing liens, claims, interests or encumbrances in the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Assets, then, following the Closing Date, (a) the Debtors are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets, and (b) the Stalking Horse is authorized to file, register, or otherwise record a certified copy of this Order which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests in the Assets of any kind or nature whatsoever.

42.    This Court shall retain jurisdiction to enforce the terms of the APA and this Sale Order.

# # #


Submitted by:

Steven R. Wirth
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Telephone: (813) 223-7333
Facsimile: (813) 223-2837
steven.wirth@akerman.com

Copy furnished to:

Steven R. Wirth, Esq.
*(Attorney Wirth is directed to serve a conformed copy of this Order and to file a Certificate of Service with the Court).*

## SCHEDULE 3.2

### REQUIRED CONSENTS

NONE

**Exhibit B**

## SCHEDULE 3.4

## INTELLECTUAL PROPERTY RIGHTS

| TRADEMARKS | Appl. No. /Reg No | Appl. Date/ Reg Date | Attorney of Record | Status |
|---|---|---|---|---|
| GRANDEST ADVENTURES | 3594674 | 3/24/2009 | Sills Cummis & Gross (as of 1/18/12) | Registered |
| *GRANDPARENTS.COM (Class 025) | 3637229 | 6/16/2009 | Joshua M. Gerben (as of 10/9/13) (changed from Sills Cummis & Gross) | Registered |
| *GRANDPARENTS.COM (Classes 035, 038, 039, 041) | 3503215 | 9/16/2008 | Joshua M. Gerben (as of 10/9/13) (changed from Sills Cummis & Gross) | Registered |
| *GRANDPARENTS.COM IT'S GREAT TO BE GRAND. & Design | 3775059 | 4/13/2010 | Joshua M. Gerben (as of 10/9/13) (changed from Sills Cummis & Gross) | Registered |
| AMERICAN GRANDPARENTS ASSOCIATION | 86653285 | 6/5/2015 | Joshua M. Gerben (as of 6/8/15) | Submitted |
| AGA (Standard Mark) | 86653373 | 6/5/2015 | Joshua M. Gerben (as of 6/8/15) | Submitted |
| AGA American Grandparents Association (stylized w/ design) | 86653028 | 6/5/2015 | Joshua M. Gerben (as of 6/8/15) | Submitted |
| GRANDPARENTS INSURANCE PLANS | 4200271 | 8/28/2012 | Sills Cummis & Gross (as of 1/18/12) | Registered |
| *GRAND CARD | 85/615047 | 5/2/2012 | Sills Cummis & Gross (as of the time of filing) | Published Statement of Use/4[th] Extension of Time due December 4, 2014 |
| GRAND INSPIRATIONS | 85/591533 | 4/6/2012 | Sills Cummis & Gross (as of the time of filing) | Published Statement of Use/3[rd] Extension of Time due August 26, 2014 |
| GRAND CORPS | 4506322 | 4/1/2014 | Sills Cummis & Gross (as of the time of filing) | Registered |
| TIMELESS YOU | 86/122,123 | 11/18/2013 | Sills Cummis & Gross (as of the time of filing) | Pending |

*Subject to licensing in accordance with that certain Alliance Agreement, among Cegedim Inc. (Opus Health Division) and Grandparents.com, Inc., dated as of March 28, 2013.

| PATENTS | Appl. No. /Reg No | Appl. Date/ Reg Date | Attorney of Record | Status |
|---|---|---|---|---|
| SYSTEM AND METHOD FOR INCENTIVIZING PURCHASES** | 61/693992 | 08/28/2012 | N/A | Provisional |

**Patents referenced in that certain Alliance Agreement, among Cegedim Inc. (Opus Health Division) and Grandparents.com, Inc., dated as of March 28, 2013, including but not limited to provisional patent 61/693992 (System and method for incentivizing purchases), are jointly held by Grand Card and Cegedim Inc. and not exclusive property of any Loan Party.

**Exhibit B**

## SCHEDULE 3.6

### ASSIGNED CONTRACTS

1.    Letter Agreement by and between HSNi, LLC and Grandparents.com, Inc., dated as of February 18, 2015.

2.    Program Agreement by and between Aetna Life Insurance Company and Grandparents.com, Inc., dated as of October 9, 2013, as amended by that certain Amendment No. 1 to Program Agreement, dated as of June 4, 2015, and as further amended by that certain Amendment No. 2 to Program Agreement, dated as of June 4, 2015.

3.    Upline Marketing Agreement by and between Aetna Life Insurance Company and Grandparents Insurance Solutions LLC, dated as of 2015.

4.    Marketing General Agent Contract, by and among Aetna Health and Life Insurance Company, Aetna Life Insurance Company, and Grandparents Insurance Solutions LLC, dated as of October 31, 2014.

5.    Marketing General Agent Contract (Addendum), by and among Aetna Health and Life Insurance Company, Aetna Life Insurance Company, and Grandparents Insurance Solutions LLC, dated as of October 31, 2014.

**Exhibit B**

## SCHEDULE 3.8

### PERMITS

NONE

**Exhibit B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

GRANDPARENTS.COM, INC.,                                   Case No. 17-14711-LMI
GRAND CARD LLC,                                           Case No. 17-14704-LMI

        Debtors.[1]                                       (Joint Administration Pending)

_____/

**ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ORDERS PURSUANT
TO 11 U.S.C. §§ 105, 363 AND 365 AND FED. R. BANKR. P. 2002, 6004, 6006, AND 9014
APPROVING BIDDING PROCEDURES, FORM AND MANNER OF SALE NOTICES,
AND SCHEDULING SALE HEARING DATE**

        This matter came on to be heard on _____, 2017 (the "Hearing"), upon the

debtors, Grandparents.com, Inc. ("GP") and Grand Card LLC ("Grand Card" and collectively

with GP, the "Debtors"), emergency motion seeking entry of an order approving (A) bidding

procedures and stalking horse bidder, (B) form and manner of sale notices, and (C) sale hearing

date (the "Motion") (ECF No. ___), and the Court having reviewed and taken judicial notice of

the file, heard argument and proffers of counsel and the Debtors' CRO, due and sufficient notice

---

[1] The address and the last four digits of the taxpayer identification of each of the debtors: (i) Grandparents.com, Inc.,
589 8th Avenue, 6th Floor, New York, NY 10018 (1114) and (ii) Grand Card LLC, 10800 Biscayne Boulevard,
Suite 750, Miami, FL 33161 (3030).

**Exhibit C**

of the Motion having been provided, good cause appearing and for the reasons stated on the record at the Hearing, good and sufficient cause appearing it is hereby

**ORDERED and ADJUDGED**:

**I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

1.    Unless otherwise indicated herein, all capitalized terms used but not defined herein shall have the meanings given in the Motion.

2.    On April 14, 2017 the Debtors filed voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.    This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

4.    On April 14, 2017, the Debtors and VB Funding, LLC (the "Stalking Horse" or "Stalking Horse Bidder") entered into that certain Asset Purchase Agreement (the "APA") attached as **Exhibit "B"** to the Motion.

5.    The Debtors are facing severe liquidity restraints and will be unable to continue operating after sixty days.

6.    The Debtors intend to seek approval of the sale of substantially all their assets to the Stalking Horse or the Successful Bidder if an auction is held.  The Debtors must be sold as a going concern to realize and maximize their value together with the assets.  To avoid irreparable harm to the Debtors' estates, the sale of the assets must close in the next 45 to 60 days.

**Exhibit C**

7.      If the sale does not close in that timeframe the Debtors will likely be out of cash and forced to cease operations, which will preclude any sale of the Debtors' assets as a going concern.

8.      The APA has been negotiated in good faith and at arm's length between the Debtors and the Stalking Horse who the Court recognizes also provided debtor-in-possession financing to the Debtors pursuant to Order of this Court.

9.      The Debtors exercised sound business judgment in negotiating and entering into the APA.

10.      The Bidding Procedures, including the Stalking Horse, are necessary to the efficient sale of the Debtors' assets and to maximize their value.

11.      Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED DETERMINED AND DECREED** that:

12.      <u>Motion Granted</u>. The Motion is granted.

13.      <u>Bidding Procedures</u>. The following Bidding Procedures are approved and shall constitute the procedures for persons seeking to bid on the sale of substantially all of the Debtors' assets (the "<u>Sale</u>"):

- **Qualified Bidder:** Any person or entity expressing an interest in purchasing the Debtors' assets (a "<u>Potential Bidder</u>") must provide the Debtors with an executed confidentiality agreement in form and substance satisfactory to the Debtors and shall deliver the following Required Supporting Materials and Good Faith Deposit prior to the Bid Deadline which shall constitute its "Bid" to the Debtors and counsel as follows:

   Debtors:

   Grandparents.com, Inc.
   Attn:  Joshua Rizack
   606 Post Road East, 614
   Westport, CT 06880

with a copy to:

Steven R. Wirth, Akerman, LLP, Attorneys for Debtors,
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
steven.wirth@akerman.com

- **Required Supporting Materials:**

i) **Executed APA**:  An executed asset purchase agreement in the same form and having the same terms as the APA and reflecting a minimum purchase price $2,100,000 (the "Topping Bid"), together with a markup or redline copy of the Potential Bidder's asset purchase agreement comparing same to the APA and reflecting any deviations from the APA.  All consideration paid to acquire the Purchased Assets shall be for cash, with no financing contingencies.

ii) **Proof Ability to Close**:  All Potential Bidders must include as part of any bid appropriate evidence that demonstrates to the reasonable satisfaction of the Debtors that such bidder has the financial ability to consummate the transactions contemplated by their APA by the Closing Date including bank statements and financial statements.  No Potential Bidder shall be entitled to bid and deemed to a Qualified Bidder unless the Debtors determine in their reasonable discretion that the Potential Bidder is financially qualified; provided that if the Potential Bidder proposes to finance the acquisition, then evidence of an unconditional lending commitment from a recognized banking institution in the amount of the cash  portion of the purchase price of such bid or the ability to post an unconditional, irrevocable letter of credit from a recognized banking institution in the amount of the cash portion of the purchase price of such bid. **The Potential Bidder shall also provide a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed.**

iii) **Assumption of Executory Contracts and Unexpired Leases:**  To the extent that the Potential Bidder proposes to include in its bid and the APA the assumption and assignment of any of  the Debtors' executory contracts or unexpired leases, a schedule shall be attached to the APA showing such contracts or leases to be assumed and assigned together with evidence of the Potential Bidder's ability to provide adequate assurance of future performance of such contracts, such as audited financial statements of the Potential Bidder, information regarding the capitalization of the Potential Bidder, information allowing the Debtors to evaluate the value of any guaranties being provided by affiliates of a Potential Bidder of its

3
**Exhibit C**

obligations under any assumed and assigned executory contracts or leases (the "<u>Adequate Assurance Package</u>").

iv)   **Good Faith Deposit:** A Potential Bidder must deliver with its Bid a good faith deposit equal to 10% of the bid's proposed purchase price in the form of a wire transfer or certified or cashier's check (the "<u>Good Faith Deposit</u>") payable to the trust account for the attorneys for the Debtors.

**A Potential Bidder satisfying the above requirements shall be deemed to be a Qualified Bidder and to have submitted a "Qualified Bid".**

**THE BID DEADLINE SHALL BE MAY 31, 2017 AT 5:00 P.M. EST.**

**Auction.** An auction (the "<u>Auction</u>") of the Assets shall be conducted by the Debtors in the event there is at least one Qualified Bidder.  The Auction shall take place at June 2, 2017 beginning at 10:00 a.m. EST at the law offices of Akerman LLP, Three Brickell City Centre, 98 Southeast Seventh Street, Suite 1100, Miami, FL 33131.

**ONLY A QUALIFIED BIDDER WHO HAS SUBMITTED A QUALIFIED BID WILL BE ELIGIBLE TO PARTICIPATE AT THE AUCTION.**

**The Qualified Bidder is not entitled to any break-up fee, termination fee or similar type of payment or reimbursement.**

**Bidding Increment.**  The minimum bidding increment at the auction shall be $100,000 or such other amount as the Debtors determine is appropriate.  The Debtors reserve the right to change the bidding increments at the Auction.

**Baseline Bid / Overbid Protection.**  In the event there are one or more Qualified Bidders and an Auction is held, the Baseline Bid will be the sum of the Qualified Bid which proposes the highest and best economic consideration to the Debtors in the Debtors' sole business judgment.

**Acceptance of Qualified Bid**. The Debtors presently intend to consummate the sale with the Stalking Horse Bidder if there is no Auction.  Otherwise, if an Auction is held the Debtors shall determine who has made the highest and best offer (the "<u>Successful Bidder</u>") and the Debtor is authorized to accept Back-Up bids.  However, the Debtors' presentation to the Bankruptcy Court for approval of the bid made by the Successful Bidder does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted such Bid only when such bid has been approved by order of the Bankruptcy Court.

**Reservation of Rights.** At the conclusion of the Auction the Debtors shall determine which bid, if any, is the highest or otherwise best offer, and (i) may reject at any time, any bid that the Debtors determine in their sole discretion to be: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the sale transaction, or (c) contrary to the best interests of the Debtors, their estates and creditors.

**Exhibit C**

**Return of Deposits**. The Good Faith Deposit of a Qualified Bidder shall be returned within three business days of the earlier of (a) the closing of a sale transaction on all or a portion of the Assets on which the Qualified Bidder made a bid or (b) 30 days after the Sale Hearing.

**Credit Bidding.**  The Stalking Horse (defined below) may credit bid at the sale in an amount up to amount owed the Stalking Horse under its DIP Loan with the Debtor plus the amount outstanding on its first priority prepetition loan to the Debtor.  Other creditors may credit bid as permitted under the Code, however credit bids of junior lienors will need to include cash bids to satisfy the any senior liens.

14.    Approval of APA and Stalking Horse.  The Stalking Horse and the APA are approved and the APA shall form the basis for the Potential Bidders to bid as more fully set forth above.  The provisions in the APA unique to the Stalking Horse shall be deleted from the APA for use by Potential Bidders in submitting their Bid.

15.    Advertising.  A soon as practicable, the Debtors shall publish the notice of sale in the Daily Business Review for Dade, Broward, and Palm Beach counties, and the Wall Street Journal.  Also, to the extent practicable, the Debtors shall publish the notice of sale in industry periodical(s) and newsletter(s).

16.    Sale Hearing.   A hearing on approval of the Sale to the Stalking Horse or Successful Bidder shall be held before this Court on June 2, 2017 (the "Sale Hearing"), at which time all interested parties shall have an opportunity to object to the Sale of the Debtors' assets as contemplated by the Bid Procedures.   At the Sale Hearing, the Court shall consider the assumption and assignment of the Designated Contracts.

17.    Form of Sale Notice.   The Sale Notice shall be in the form set forth in Notice of Filing of Sale Notice (ECF No. _____).

# # #

**Exhibit C**

Submitted by:

Steven R. Wirth
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Telephone: (813) 223-7333
Facsimile: (813) 223-2837
steven.wirth@akerman.com

Copy furnished to:

Steven R. Wirth, Esq.
*(Attorney Wirth is directed to serve a conformed copy of this Order and to file a Certificate of Service with the Court).*

**Exhibit C**